# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## AGENCY APPEAL PRE-ARGUMENT STATEMENT (FORM C-A)

☐ APPLICATION FOR ENFORCEMENT      ☑ PETITION FOR REVIEW

1. SEE NOTICE ON REVERSE.      2. PLEASE TYPE OR PRINT.      3. STAPLE ALL ADDITIONAL PAGES.

| CAPTION: | AGENCY NAME: | AGENCY NO.: |
|---|---|---|
| Unified Turbines, Inc. v. Adminstrative Review Board of the United States Department of Labor *Case # 13-3124* | U.S. Department of Labor | 13-010 |
| | DATE THE ORDER UPON WHICH REVIEW OR ENFORCEMENT IS SOUGHT WAS ENTERED BELOW: June 12, 2013 | ALIEN NO : (Immigration Only) |
| | DATE THE PETITION OR APPLICATION WAS FILED: *August 7, 2013* | Is this a cross-petition for review / cross-application for enforcement? ☐ YES ☑ NO |

| Contact Information for Petitioner(s) Attorney: | Counsel's Name:    Address:    Telephone No.:    Fax No.:    E-mail: |
|---|---|
| | John L. Franco, Jr. 110 Main Street, Burlington, Vermont 05401, Tel.(802) 864-7207, Fax (802) 859-1876, email johnfrancolaw@aol.com |

| Contact Information for Respondent(s) Attorney: | Counsel's Name:    Address:    Telephone No.:    Fax No.:    E-mail: |
|---|---|
| | Lisa M. Werner, 192 College St., Burlington, VT. 05401, Tel (802)865-0088, Fax (802) 865-4012, email lmwesq@sover.net |

| JURISDICTION OF THE COURT OF APPEALS (provide U.S.C. title and section): 49 U.S.C. (b)(4(A) | APPROX. NUMBER OF PAGES IN THE RECORD: 500 | APPROX. NUMBER OF EXHIBITS IN THE RECORD: 40 | Has this matter been before this Circuit previously? ☐ Yes ☑ No  If Yes, provide the following:  Case Name:  2d Cir. Docket No.:    Reporter Citation: (*i.e.*, F.3d or Fed. App.) |
|---|---|---|---|

**ADDENDUM "A":** COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION; (2) THE RESULT BELOW; AND (3) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS PETITION FOR REVIEW OR APPLICATION FOR ENFORCEMENT.

**ADDENDUM "B":** COUNSEL MUST ATTACH TO THIS FORM: (1) THE RELIEF REQUESTED; (2) A LIST OF THE PROPOSED ISSUES; AND (3) THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

### PART A: STANDING AND VENUE

| STANDING | VENUE |
|---|---|
| PETITIONER / APPLICANT IS:  ☐ AGENCY   ☑ OTHER PARTY  ☐ NON-PARTY (SPECIFY STANDING): | COUNSEL MUST PROVIDE IN THE SPACE BELOW THE FACTS OR CIRCUMSTANCES UPON WHICH VENUE IS BASED:  The alleged retaliation occurred at the petitioner's former facility in Winooski, Vermont. |

**IMPORTANT. COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

| PART B: NATURE OF ORDER UPON WHICH REVIEW OR ENFORCEMENT IS SOUGHT |
|---|
| (Check as many as apply) |

**TYPE OF CASE:**

| | | | | |
|---|---|---|---|---|
| _____ | ADMINISTRATIVE REGULATION/ RULEMAKING | _____ | IMMIGRATION-includes denial of an asylum claim | |
| _____ | BENEFITS REVIEW | _____ | IMMIGRATION-does NOT include denial of an asylum claim | |
| _____ | UNFAIR LABOR | _____ | TARIFFS | |
| _____ | HEALTH & SAFETY | X | OTHER: | |
| _____ | COMMERCE | | (SPECIFY) Whistleblower protection | |
| _____ | ENERGY | | | |

1. Is any matter relative to this petition or application still pending below?  ☒ Yes, specify: fee shift application   ☐ No

2. To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:

   (A)   Arises from substantially the same case or controversy as this petition or application ?   ☐ Yes   ☒ No

   (B)   Involves an issue that is substantially similar or related to an issue in this petition or application ?   ☐ Yes   ☒ No

If yes, state whether ☐ "A," or ☐ "B," or ☐ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: | Docket No. | Citation: | Court or Agency: |
|---|---|---|---|
| Name of Petitioner or Applicant: | | | |

| Date: August 20, 2013 | Signature of Counsel of Record: |
|---|---|

# NOTICE TO COUNSEL

Once you have filed your Petition for Review or Application for Enforcement, you have only 14 days in which to complete the following **important steps:**

1. Complete this Agency Appeal Pre-Argument Statement (Form C-A); serve it upon your adversary, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.
2. Pay the $450 docketing fee to the Clerk of the Second Circuit, unless you are authorized to prosecute the appeal without payment.

   **PLEASE NOTE: IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 CALENDAR DAYS, YOUR PETITION FOR REVIEW OR APPLICATION FOR ENFORCEMENT WILL BE DISMISSED.** *SEE* LOCAL RULE 12.1.

## ADDENDUM "A"

This is a whistleblower protection action initiated by John Nagle, a former employee of Unified Turbines, Inc., formerly of Winooski, Vermont, brought under the whistleblower protection provisions of the so-called "AIR 21" statute, 49 U.S.C. §42121.

The matter was investigated by the U.S. Department of Labor with a recommendation of that there was no reasonable cause to believe that a violation had occurred.

Mr. Nagle filed objections, and the matter was assigned to an Administrative Law Judge for hearing. The ALJ issued a <u>Decision and Order Dismissing the Complaint</u> on September 27, 2010 also finding no violation.

Mr. Nagle then filed a petition for review with the Administrative Review Board which reversed and remanded the ALJ's determination in a <u>Decision and Order of Remand</u> issued March 12, 2012.

The ALJ then issued a <u>Decision and Order on Remand</u> on October 25, 2012 reversing himself and finding a whistleblower violation and awarding back pay, damages, prejudgment interest, and ordered reinstatement, plus an award of attorney's fees and litigation costs. Unified Turbines then brought a petition for review to the Administrative Review Board, which affirmed the ALJ's second decision in a revised <u>Final Decision and Order</u> issued June 12, 2013.

Copies of the four referenced decisions are attached.

## ADDENDUM "B"

**(1)     RELIEF REQUESTED**.

The relief requested by Unified Turbines is to reverse and vacate the decision of the ARB entirely, and alternatively to vacate the back pay and damages award.

**(2)     A LIST OF PROPOSED ISSUES.**

The proposed issues are the failure of Mr. Nagle to establish a whistleblower retaliation case as a matter of law

To prevail the employee must prove by a preponderance of the evidence that (1) s/he was engaged in protected activity, (2) the employer knew s/he was engaged in the protected activity, (3) that s/he suffered an unfavorable personnel action, and (4) that the protected activity was a contributing factor in the unfavorable action. Mr. Nagle failed to establish this by substantial evidence.

• As a matter of law he did not suffer any unfavorable personnel action at the hands of Unified;

• He was not engaged in any protected activity which could be considered a contributing factor to any unfavorable employment action; and

• He was not engaged in any protected activity which could be considered a contributing factor to any unfavorable employment action that was known to Unified Turbines.

Alternatively,

• Mr. Nagle failed to mitigate any damages or back pay claim.

• The Department of Labor's regulation that the ALJ's reinstatement order is operative despite the pendency of Unified's petition for review before the ARB is *ultra vires* and unconstitutional.

• The fee shift granted Mr. Nagle was excessive.

**(3)     STANDARD OF REVIEW.**

The standard of review for all issues is whether the ARB's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706(2)(A).

**U.S. Department of Labor**   Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

JOHN NAGLE,                    ARB CASE NO. 13-010

      COMPLAINANT,        ALJ CASE NO. 2009-AIR-024

    v.                        DATE:  JUN 1 2 2013

UNIFIED TURBINES, INC.,

      RESPONDENT.


BEFORE:    THE ADMINISTRATIVE REVIEW BOARD


## ERRATUM

On May 31, 2013, the Administrative Review Board (ARB) issued a Final Decision and Order in Nagle's case. The docket number included in the caption, ARB No. 11-024, was incorrect. Accordingly, we reissue the decision with the corrected docket number, ARB No. 13-010. In all other respects, the Final Decision and Order remains the same.

SO ORDERED.


JOANNE ROYCE
Administrative Appeals Judge


PAUL M. IGASAKI
Chief Administrative Appeals Judge


E. COOPER BROWN
Deputy Chief Administrative Appeals Judge

**U.S. Department of Labor**

Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

JOHN NAGLE,                                      ARB CASE NO.  13-010

      COMPLAINANT,               ALJ CASE NO.  2009-AIR-024
                            **MAY 3 1 2013**

      v.                                    DATE:

UNIFIED TURBINES, INC.,                  DATE REISSUED:  **JUN 1 2 2013**

      RESPONDENT.

BEFORE:    THE ADMINISTRATIVE REVIEW BOARD

Appearances:

*For the Complainant:*
    Lisa M. Werner, Esq.; *Clark, Werner & Flynn, P.C.;* Burlington, Vermont

*For the Respondent:*
    John L. Franco, Jr., Esq.; *Law Office of John L. Franco, Jr.;* Burlington, Vermont

BEFORE:  Paul M. Igasaki, *Chief Administrative Appeals Judge*; E. Cooper Brown, *Deputy Chief Administrative Appeals Judge*; and Joanne Royce, *Administrative Appeals Judge*

## FINAL DECISION AND ORDER

    John Nagle filed a complaint with the Department of Labor's Occupational Safety and Health Administration alleging that his former employer, Unified Turbines, Inc. (UT), retaliated against him in violation of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century[1] and its implementing regulations.[2]  Following a remand from the Administrative Review Board (ARB) on October 25, 2012, an Administrative Law Judge (ALJ) issued a

---

[1]     49 U.S.C.A. § 42121 (Thomson/West 2007) (AIR 21).

[2]     29 C.F.R. Part 1979 (2012).

2

Decision and Order finding that Nagle proved by a preponderance of the evidence that his protected activity was a contributing factor to the adverse action and that UT failed to demonstrate by clear and convincing evidence that it would have terminated Nagle's employment in the absence of his protected activity.[3] D. & O. on Rem. at 13-15. The ALJ ordered UT to reinstate Nagle and pay Nagle back pay and compensatory damages, and further indicated that upon application, Nagle was entitled to attorney's fees and litigation costs. *Id.* at 20. We summarily affirm.[4]

To prevail on his whistleblower complaint Nagle must prove by a preponderance of the evidence that (1) he engaged in activity protected by AIR 21, (2) that unfavorable personnel action was taken against him, and (3) that the protected activity was a contributing factor in the unfavorable personnel action being taken against him.[5] The ALJ determined that Nagle's protected activity was a contributing factor in UT's decision to terminate his employment. We find the ALJ's findings of fact and legal analysis are supported by substantial evidence of record and are in accordance with applicable law.

The ALJ concluded that Nagle engaged in protected activity on several occasions, including on December 16, 2008, when he reported to his employers that "M"[6] was engaged in an illicit drug transaction and was abusing prescription narcotic medication while on the job. D. & O. on Rem. at 11. The ALJ had previously found and adhered to the finding "'that a reasonable person with Nagle's training and experience could believe that M's ongoing abuse of drugs and deteriorating performance was in violation of FAA regulations.'"[7] *Id.* (quoting *Nagle*

---

[3]     *Nagle v. Unified Turbines,* ALJ No. 2009-AIR-024 (Oct. 25, 2012)(D. & O. on Rem.).

[4]     The Secretary of Labor has delegated to the ARB her authority to issue final agency decisions under AIR 21 and its implementing regulations. Secretary's Order No. 2-2012 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 77 Fed. Reg. 69378 (Nov. 16, 2012); 29 C.F.R. § 1979.110(a). The ARB reviews an ALJ's findings of fact under the substantial evidence standard. 29 C.F.R. § 1979.110(b). The ALJ's legal conclusions are reviewed de novo. *Rooks v. Planet Airways, Inc.,* ARB No. 04-092, ALJ No. 2003-AIR-035, slip op. at 4 (ARB June 29, 2006).

[5]     49 U.S.C.A. § 42121(b)(2)(B)(iii). *See Peck v. Safe Air Int'l, Inc.,* ARB No. 02-028, ALJ No. 2001-AIR-003, slip op. at 9 (ARB Jan. 30, 2004) (explaining that to "demonstrate" under the statute is interpreted as having to prove by a preponderance of the evidence).

[6]     We refer, as did the ALJ, to Nagle's co-worker by the initial "M" because of the sensitive nature of the allegations regarding his conduct.

[7]     UT asserts that "[t]he FAA's regulations do not address the use of medications by a person for whom they were prescribed, which was the allegation here." We disagree. The FAA regulations at 14 C.F.R. § 120.33(b) "make it a violation for an employer to knowingly use an individual to perform a safety sensitive function, as defined by 14 C.F.R. § 120.105 and 120.215 while that individual has a prohibited drug in his system." "The prohibited drugs include marijuana, opiates, phencyclidine (PCP) and amphetamines. 14 C.F.R. § 120.7(m) c.f. 40 C.F.R. 40.85(b)." *Id.* M confirmed that he was abusing prescription opiates during the relevant time period, and the ALJ so

*v. Unified Turbines, Inc.*, ALJ No. 2009-AIR-024, slip op. at 15, (Sept. 27, 2010)(D. & O.). The record shows that Nagle brought M's drug abuse to the attention of his employers on several occasions including on December 16, 2008. Hearing Transcript (Tr.) at 47-49, 59-60, 182-84, 189-92. We hold that the ALJ's finding of protected activity is supported by substantial evidence.

The ALJ also concluded that Nagle met his burden to prove by a preponderance of the evidence that he suffered an adverse employment action. D. & O. on Rem. at 13. The ALJ found that UT terminated Nagle's employment under Board precedent as articulated in *Minne v. Star Air*[8] and *Klosterman v. E. J. Davies*.[9] In keeping with the precedent articulated in those cases, the ALJ found that "Nagle did not resign" and UT's behavior, rather than Nagle's, ended the employment relationship. *Id.* at 9, 12. Based on the facts as found by the ALJ, UT sent Nagle home on December 24, 2008. *Id.* at 12. When Nagle called Deavitt to talk about what happened on December 27, he got Deavitt's voicemail and left a message. *Id.* Deavitt never returned Nagle's call. *Id.* Deavitt failed to call Nagle back even after Deavitt found out that "Nagle thought he'd been fired and that M was the aggressor in the December 24th altercation." *Id.* Further, it was UT's protocol to call employees if they did not come to work as planned, and UT "departed from its normal protocol of calling an absent employee and decid[ed] instead to interpret Nagle's failure to report for work on December 29th as a voluntary quit." *Id.* (citing Tr. at 224-25). The ALJ reasoned that it was thus UT's behavior that ended the employment relationship. There is substantial evidence in the record to support the ALJ's fact finding that UT "terminated" Nagle's employment under controlling DOL precedent.[10]

The ALJ further concluded that Nagle proved by a preponderance of the evidence that his protected activity under AIR 21 was a contributing factor to his discharge. In addition to the

---

found. D. & O. on Rem. at 3. The regulations do not differentiate between prescribed and illegal opiates in its prohibition.

[8]    *Minne v. Star Air, Inc.*, ARB No. 05-005, ALJ No. 2004-STA-026 (ARB Oct. 31, 2007).

[9]    *Klosterman v. E.J. Davies, Inc.*, ARB No. 08-035, ALJ No. 2007-STA-019 (ARB Sept. 20, 2010).

[10]    In its brief, UT asserts that the ALJ found in the prior D. & O. that Deavitt told Nagle to report to work on Monday, December 29. UT Br. at 10. This assertion mischaracterizes both what the ALJ found, and the evidence on this issue. Regarding what Deavitt said to Nagle when he told him to leave the shop on December 24, the ALJ properly credited the testimony of Dan Hubbert as a credible and neutral witness. D. & O. at 16. Hubbert testified that Nagle told him that Deavitt had told him to "'put his F-ing truck in gear . . . [and] take the long weekend to think about what he had done . . . .'". *Id.* (quoting Tr. at 325). Additionally, the record does not show that Deavitt told Nagle to report to work, but instead, by his own testimony, that he told Nagle to "think about whether you still want to work here and come back on Monday and we'll talk about it." Tr. at 208. Rather than an unqualified instruction to return to work, it appears to be an instruction to think and then perhaps negotiate in some way or otherwise discuss the possibility of getting his job back after the holiday. *See also* Tr. at 210, 229:

4

temporal proximity between the protected activity and termination, the ALJ explained that Nagle's protected activity "tended to affect the outcome which was Unified Turbines' decision not to return Nagle's telephone call and instead interpret his absence from work on December 29, 2008, as a voluntary quit." D. & O. on Rem. at 14-15. As discussed above, Nagle engaged in protected activity on December 16, 2008, when he reported to his employer that M was abusing prescription narcotic medication while on the job and that M was drug dealing outside of the UT shop. *Id.* at 11, 14. The ALJ reasoned that the reports of the drug dealing were intertwined with Nagle's reports that M had a problem with drugs.[11] UT informed M that Nagle was the source of the complaint that he had been observed in an illicit drug transaction outside of the shop." *Id.* The ALJ found that "M started the altercation because he was upset that Nagle had reported his suspected drug dealing to management." *Id.* The altercation is what caused Deavitt to angrily order Nagle to leave the premises. *Id.* It also caused Deavitt "to not return Nagle's call and instead let Nagle believe that he'd been fired." *Id.* Thus, there are several identifiable links in the chain of causation from Nagle's protected activity to the adverse action UT took against him, establishing that Nagle's protected activity was a factor in UT's termination of his employment. Substantial evidence in the record supports the ALJ's findings of fact regarding causation.

The ALJ further found that UT failed to demonstrate by clear and convincing evidence that it would have taken the same unfavorable action in the absence of protected activity. D. & O. on Rem. at 15. We find that the substantial evidence of record supports this finding and that it is in accordance with applicable law.

Finally, UT argues that Nagle's reinstatement should be stayed both because (1) the AIR 21 regulation providing for the remedy of reinstatement is unconstitutional and (2) reinstatement is inappropriate given irreconcilable animosity between the parties and lack of a suitable job opening for Nagle.

The regulations at 29 C.F.R. § 1979.109(c) require that an ALJ's order of reinstatement be immediately effective with no opportunity for stay.[12] The Respondent argues that this

---

[11]  Nagle's report that M engaged in an illegal drug transaction outside of the shop "was one of the three separate, specific communications to Unified Turbines management regarding M's suspected abuse of prescription drug medication . . . ." The ALJ explained that Nagle reported M's conduct on December 16, 2008, to management "because he believed that it was further evidence that M had a 'problem' with abusing prescription pain medication that was impacting on his performance." D. & O. on Rem. at 11.

[12]  *Compare* 29 C.F.R. § 1979.110(b)("If a case is accepted for review, the decision of the administrative law judge shall be inoperative unless and until the Board issues an order adopting the decision, except that a preliminary order of reinstatement shall be effective while review is conducted by the Board."), *with* 29 C.F.R. § 1980.110(b)("If a case is accepted for review, the decision of the administrative law judge shall be inoperative unless and until the Board issues an order adopting the decision, except that a preliminary order of reinstatement shall be effective while review is conducted by the Board, **unless the ARB grants a motion by the respondent to stay the order based on exceptional circumstances**."). (Emphasis added).

regulation violates due process and is unconstitutional. The ARB is not authorized to rule on the constitutionality of Department of Labor regulations.[13]

Regarding the Respondent's argument that a lack of a suitable job opening or hostility between the parties warrants staying the ALJ's order of reinstatement, we note that although the regulations do not specifically provide for a stay, the regulations state that the ALJ shall order reinstatement "where appropriate." 29 C.F.R. § 1979.109(b). Accordingly, the ARB has recognized that circumstances may exist in which reinstatement is impossible or impractical and alternative remedies are necessary.[14] Depending on the circumstances, an ALJ may award front pay or "economic reinstatement" in lieu of reinstatement.[15] Nothing stopped the Respondent from introducing evidence at trial, or more recently following our remand to the ALJ, demonstrating that reinstatement was not appropriate in this case. But neither the argument nor any supporting evidence was before the ALJ, and we therefore decline to address it.[16] We thus affirm the ALJ's order of reinstatement.

UT did not challenge the *amount* of the ALJ's back pay award. Instead, UT argued that no back pay is appropriate because Nagle failed to "mitigate" his damages as demonstrated by

---

[13] *See* Secretary's Order No. 2-2012 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 77 Fed. Reg. 69378 (Nov. 16, 2012) ("The Board shall not have jurisdiction to pass on the validity of any portion of the Code of Federal Regulations that has been duly promulgated by the Department of Labor and shall observe the provisions thereof, where pertinent, in its decisions."). Further, with respect to the Respondent's argument that the regulations do not provide for an opportunity to stay a reinstatement order, we note that 29 C.F.R. § 1979.114 authorizes both the ALJ and the Board to waive any rule for good cause shown.

[14] *Clemmons v. Ameristar Airways*, ARB No. 08-067, ALJ No. 2004-AIR-011; slip op. at 12 (May 26, 2010); *Rooks v. Planet Airways*, ARB No. 04-092, ALJ No. 2004-AIR-092, slip op. at 9 (June 29, 2006).

[15] *See* 68 Fed. Reg. 14099, 14104 (Mar. 21, 2003) ("economic reinstatement" entitles a complainant to "receive the same pay and benefits that he received prior to his termination, but not actually return to work.").

[16] We will not consider arguments a party did not but could have presented to the ALJ. *Mancinelli v. Eastern Air Center*, ARB No. 06-085, ALJ No. 2006-SOX-008, slip op. at 5 (ARB Feb. 29, 2008). Further, when deciding whether to consider new evidence, the Board ordinarily relies upon the same standard found in the Rules of Practice and Procedure for Administrative Hearings Before the Office of Administrative Law Judges, 29 C.F.R. Part 18, which provides that "[o]nce the record is closed, no additional evidence shall be accepted into the record except upon a showing that new and material evidence has become available which was not readily available prior to the closing of the record." 29 C.F.R. § 18.54(c); *see Welch v. Cardinal Bankshares Corp.*, ARB No. 06-062, ALJ No. 2003-SOX-015, slip op. at 5-6 (ARB June 9, 2006); *see e.g., Williams v. Lockheed Martin Energy Sys., Inc.*, ARB No. 98-059, ALJ No. 1995-CAA-010, slip op. at 6-7 (ARB Jan. 31, 2001) (regarding the comparable whistleblower protection provisions under the environmental whistleblower acts). The Respondent has not made such a showing.

the ALJ's finding regarding "Nagle's failure to do anything to preserve his employment at Unified other than place a call to Deavitt . . . .". D. & O. on Rem. at 20. However, as the ALJ explained, this finding was not legally determinative of whether Nagle was improperly terminated. Nor, by extension, does it have any bearing on an award of back pay, to which a complainant is presumptively entitled upon a finding of illegal termination under AIR 21.[17] Instead, the ALJ's reference to Nagle's "contributory" behavior served to support his decision to make a compensatory award at the lower end of the $50,000 to $100,000 range in non-economic damages – a range which the ALJ amply supported both legally and factually. We affirm the $26,128.75 back pay award as well as the $50,000 compensatory damage award.

### CONCLUSION

The substantial evidence of record supports the ALJ's findings of fact, and we agree with his legal analysis and conclusions. We thus **AFFIRM** the ALJ's Decision and Order issued October 25, 2012, awarding Nagle damages and ordering reinstatement.

As the prevailing party, Nagle is also entitled to costs, including reasonable attorney's fees, for legal services performed before the ARB. Nagle's attorney shall have 30 days from receipt of this Final Decision and Order in which to file a fully supported attorney's fee petition with the ARB, with simultaneous service on opposing counsel. Thereafter, UT shall have 30 days from its receipt of the fee petition to file a response.

**SO ORDERED.**

_JOANNE ROYCE_
**JOANNE ROYCE**
**Administrative Appeals Judge**

_PAUL M. IGASAKI_
**PAUL M. IGASAKI**
**Chief Administrative Appeals Judge**

_E. COOPER BROWN_
**E. COOPER BROWN**
**Deputy Chief Administrative Appeals Judge**

---

[17]  UT does not dispute that Nagle mitigated his back pay damages by finding alternative employment after his termination. D. & O. on Rem. at 16.

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES
# BOSTON, MASSACHUSETTS

**Issue Date: 25 October 2012**

OALJ NO.: 2009-AIR-00024

---

**JOHN NAGLE,**
*Complainant,*

*v.*

**UNIFIED TURBINES, INC.,**
*Respondent.*

---

*Before:*　　　Daniel F. Sutton, Senior Administrative Law Judge[1]

*Appearances:*

Lisa M. Werner, Esq., *Clark, Werner & Flynn, P.C.*, Burlington, Vermont, for the Complainant

John L. Franco, Jr., Esq., Burlington, Vermont, for the Respondent

## DECISION AND ORDER ON REMAND

### I. Statement of the Case

     This matter, which arises from a complaint of discrimination filed under the whistleblower protection provisions of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), 49 U.S.C.A. § 42121 (West 2007), and its implementing regulations, 29 C.F.R. Part 1979 (2011), is before the Senior Administrative Law Judge ("ALJ") on remand from the Department of Labor's Administrative Review Board ("ARB"). *Nagle v. Unified Turbines Turbines, Inc.*, ARB No. 11-004, ALJ No. 2009-AIR 024 (ARB Mar. 30, 2012) ("ARB Dec. and Ord.")

---

[1] The ALJ retired on December 31, 2010 after issuing the original decision and order in this matter, and returned as a Senior ALJ on July 30, 2012.

The AIR 21 proceeding began when John Nagle ("Nagle" or "Complainant") filed a complaint alleging that his employer, Unified Turbines Inc. ("Unified Turbines" or "Respondent"), fired him from his position as a welder on December 24, 2008 in retaliation for his engaging in activities protected under AIR 21 and the Occupational Safety and Health Act of 1970 (the "OSH Act"), 29 U.S.C. § 651 *et seq.* After investigation, the U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA"), acting for the Secretary of Labor, notified Nagle by letter dated July 28, 2009 of the Secretary's finding that there was no reasonable cause to believe that Unified Turbines had violated either AIR 21 or the OSH Act. Nagle filed a timely objection to the Secretary's AIR 21 determination pursuant to 29 C.F.R. § 1979.106, and he requested a formal hearing before an ALJ pursuant to 29 C.F.R. § 1979.107.[2]

Following a *de novo* evidentiary hearing, the ALJ concluded in a decision and order issued on September 27, 2010 ("ALJ Dec. and Ord.") that although Nagle had proved that he engaged in activity protected by AIR 21 when he made complaints about a coworker's abuse of prescription narcotics on the job,[3] he failed to establish that he had been fired or otherwise subjected to an adverse employment action. ALJ Dec. & Ord. at 13-15, 16-17. Rather, the ALJ determined that Nagle had voluntarily resigned from his job at Unified Turbines. *Id.* Accordingly, his complaint was dismissed.

Nagle appealed the dismissal of his complaint to the ARB.[4] In its decision, the ARB initially concluded that substantial evidence supported the ALJ's finding that Nagle had engaged in protected activity under AIR 21 and that the ALJ had correctly concluded that Nagle had proved employer knowledge of his protected activity, both of which are necessary elements in an AIR 21 case. ARB Dec. and Ord. at 4. With respect to the adverse action element of Nagle's AIR 21 claim, the ARB noted that the ALJ had looked to Vermont law in determining that Nagle had voluntarily quit and was not, therefore, subject to an adverse employment action. *Id.* at 5. However, the ARB stated that precedent under other whistleblower statutes enforced by the Department of Labor, not Vermont law, controls the determination as to whether there was an adverse action, and it remanded the case "for consideration of whether Nagle was discharged under ARB precedent. *Id.*

On remand, the parties were permitted, on Unified Turbines' unopposed motion, to file supplemental briefs addressing the issues to be considered on remand as well as reply briefs. Helpful briefs were received from both parties and are referred to herein as "Nagle Supp. Br." and Unified Turbines Supp. Br." Both parties also filed reply briefs which are referred to herein as "Nagle Rep. Br." and "Unified Turbines Rep. Br."

Upon further consideration of the evidence, the parties' arguments, and controlling ARB precedent pursuant to the ARB's instructions, I find and conclude for the reasons discussed below, that Nagle has met his burden of proving that he was discharged under ARB precedent,

---

[2] Nagle's claims under the OSH Act are not a part of this proceeding. Jurisdiction over retaliation claims under section 11(c) of the OSH Act lies in the district courts. 29 U.S.C. § 660(c).

[3] The co-worker is referred to as "M" in both the initial ALJ and ARB decisions due to the sensitive nature of the allegations regarding his conduct. Accordingly, he is referred to as "M" herein as well.

[4] The Secretary of Labor delegated her authority to the ARB to issue final agency decisions in AIR 21 cases. Secretary's Order No. 1-2010 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 75 Fed. Reg. 3924 (Jan. 15, 2010); 29 C.F.R. § 1979.110(a).

that his protected activity under AIR 21 was a contributing factor to his discharge, and that Unified Turbines has not demonstrated by clear and convincing evidence that Nagle would have been discharged in the absence of his protected activity. Accordingly, Nagle is entitled to relief under AIR 21.

## II. Prior Findings of Fact and Conclusions of Law

My prior findings of fact are set out in detail in the first decision. ALJ Dec. and Ord. at 3-13. In the interest of brevity, I adopt the ARB's summary of my findings:

Unified Turbines is a contractor of an air carrier under AIR 21 and repairs, overhauls, and modifies components for various airline manufacturers. It is privately owned by two partners, Richard Karnes and Karl Deavitt. Unified Turbines employed Nagle as a welder beginning in October 2007.

In August of 2008, Nagle began to notice a change in the quality of one of his co-worker's work (hereinafter referred to as "M") and became aware that M was taking prescription pain medication. Nagle thought that M's work was deteriorating and that he seemed to be "high."

At some point during this time period, Nagle told Deavitt that the quality of M's work was poor, that he had seen M taking three or four pain pills at a time, and that M seemed high. Deavitt told him that he knew that M was taking prescription medication, but he was unaware that he was abusing it.

After this conversation, in September or October of 2008, Nagle saw M open the drawer of an absent co-worker. Nagle knew that this co-worker stored prescription pain pills in the tool drawer on his bench. Nagle later removed the bottle of pills, gave them to Karnes or Deavitt, and told them that he believed that M had an interest in the pills and that he did not want to be implicated if the pills went missing since he was working at the absent co-worker's bench.

On December 16, 2008, Nagle saw what he believed was M selling pills on the street outside of the work shop. He told Deavitt that he saw M selling pills and that M had problems. Deavitt told Nagle that he could not do anything unless he witnessed M doing something improper. On the same day, Nagle made a complaint to the Winooski, Vermont Police Department, that he saw M selling prescription drugs on the street.

M later confirmed that he was abusing prescription opiates during the fall of 2008 when Nagle made complaints to his superiors. M's job performance deteriorated during this time period.

On the morning of December 24, 2008, Nagle and M engaged in a minor shoving match that ended without any third-party intervention. It is not clear who began the altercation or who pushed whom first. Following the altercation, M told Deavitt about the incident and said that he could not work with Nagle anymore

and that Deavitt had to do something about it. Shortly thereafter, Deavitt spoke to Nagle, informed him that he had "gone too far," instructed him to leave, and told Nagle to think things over during the upcoming holiday weekend. Deavitt did not say that Nagle was fired.

Nagle believed he was fired, so he went back into the shop to retrieve his welding helmet and left. M was not sent home after the incident and continued to work for the remainder of the day. The workday on December 24, 2008, Christmas Eve, ended at noon.

On December 27, 2008, Nagle called his co-worker, Dan Hubbert, to discuss the incident. Nagle told Hubbert that he believed he was fired based of what was said even though Deavitt did not use the words "you're fired." Hubbert suggested that Nagle go into work the following Monday or at least call Deavitt or Karnes.

That same day, Nagle followed Hubbert's suggestion, telephoned Karl Deavitt's personal cell phone, and left a voicemail message on the cell phone during the Christmas holiday asking for a return call. Karl Deavitt did not return Nagle's call.

Unified Turbines paid Nagle for Christmas Eve, for Christmas Day, and for "Boxing Day" (Friday, December 26, 2008). Nagle did not return to work on Monday, December 29, 2008, or any time thereafter. Unified Turbines discontinued paying Nagle beginning on December 29, 2008. At some point during the week of December 29, 2008, Hubbert told Deavitt about his phone conversation with Nagle on December 27, 2008, and Nagle's belief that Deavitt had fired him.

ARB Dec. and Ord. at 2-3 (footnote omitted).

On these facts, I concluded that Nagle's complaints to Unified Turbines management about M's suspected drug abuse were protected under AIR 21 because "a reasonable person with Nagle's training and experience could believe that M's ongoing abuse of drugs and deteriorating performance was in violation of [applicable Federal Aviation Administration] regulations. ALJ Dec. and Ord. at 15. I further concluded that Nagle's report to the Winooski Police on December 16, 2008, was not protected because the report was not made to the federal government or at the direction of a federal entity. *Id.* at n. 11. As discussed above, I also found that Unified Turbines had knowledge of Nagle's protected activity, but I concluded for the following reasons that the termination of his employment at Unified Turbines was not an adverse employment action that could be remedied under AIR 21:

First, it is undisputed that Deavitt never told Nagle that he was fired, that his employment was terminated, or that he should not return to work at Unified Turbines. Second, the ALJ finds that the weight of the evidence establishes that Deavitt did not simply tell Nagle to go home in a profanity-laced tirade in the

parking lot outside of Unified Turbines on the morning of December 24, 2008. Dan Hubbert testified that Nagle called him on December 27, 2008. Hubbert testified that Nagle relayed that Deavitt had told him "to put his F-ing truck in gear . . . [and] take the long weekend to think about what he had done . . . ." HT at 325. Based on observation of his demeanor and in consideration of his testimony in light of the entire record, the ALJ finds that Hubbert is a particularly credible and neutral witness who showed no tendency to color or shape his testimony despite his long friendship with Nagle and continued employment relationship with Unified Turbines. Moreover, while the ALJ does not credit Deavitt's testimony that he repeated his directives to Nagle after he had returned to the shop, Hubbert's testimony that Nagle acknowledged being told to take the long weekend to think about what he had done, is consistent with William Kinsell's testimony that Deavitt stated upon reentering the shop from the parking lot "that he told John that he had four days, because we had a four-day vacation, to think about if he wanted to still work at Unified Turbines and, if not, he could leave." HT at 308. Noting that Deavitt made these statements moments after his heated conversation with Nagle in the parking lot, the ALJ finds that it is highly probable that the statements are accurately reflective of what Deavitt said to Nagle. Therefore, the ALJ finds that not only did Deavitt not tell Nagle that he was fired, he told him to think things over during the upcoming holiday weekend. Finally, the fact that Unified Turbines paid the Claimant for the duration of his shift on December 24, 2008, and for both the Christmas and Boxing Day holidays is corroborative of Unified Turbines' claim that Deavitt did not fire Nagle on December 24, 2008. Consequently, the ALJ finds that Nagle was not fired on December 24, 2008, but rather that he was sent home two hours early without loss of pay because he had been involved in a physical altercation in the shop with M.

The ALJ further finds that the evidence related to the events following December 24, 2008, establish that Nagle abandoned his job and was not subjected to any adverse personnel action. When Nagle called Deavitt [sic][5] on December 27, 2008, and expressed a belief that he'd been fired, Hubbert got Nagle to recognize that Deavitt had not said that he was fired. Hubbert also tried to persuade Nagle to return to Unified Turbines on Monday after the holiday weekend to discuss his status. Nagle declined to return to work on Monday and he instead called Deavitt over the weekend and left a message that was not returned. Nagle's claim that these facts -- essentially an unreturned telephone call -- removed any ambiguity lingering from December 24th and confirmed that he'd been fired is simply untenable. Under Vermont law, an employer's statement that an employee has the option of either "shaping up or shipping out" does not equate to an involuntary or coerced termination. *Lane v. Department of Employment Sec.*, 134 Vt. 9, 11, 347 A.2d 454, 456 (1975); *see also Hamilton v. Department of Employment Sec.*, 139 Vt. 326, 328-29, 428 A.2d 1108, 1109 (1981) (resignation after warning of termination if performance did not improve was not involuntary or coerced). Nagle was told to go home and think things over which

---

[5] The reference to Deavitt in the earlier decision was in error as the record shows that Nagle called Hubbert on December 27, 2008 to express his belief that he'd been fired. HT at 69-70.

at most is tantamount to a "shape up or ship out" directive. However, the more appropriate reading is that Deavitt simply told Nagle to think about what he had done and if he wanted to stay at Unified Turbines – a decision to be made on Nagle's own accord – as Deavitt never expressly mentioned the possibility of Nagle being fired. There is ample evidence in the record that Nagle was dissatisfied with his job and planned to quit. There also is uncontradicted evidence that Unified Turbines accommodated Nagle's family situation and tolerated his chronic tardiness. In these circumstances, the ALJ finds that Nagle's professed assumption that he'd been terminated and his decision not to report to work on Monday, December 29, 2008, were objectively unreasonable and can only be characterized as a voluntary resignation.

ALJ Dec. and Ord. at 16-17 (footnote omitted). Based on the finding that Nagle failed to establish the adverse employment action element of his AIR 21 claim, I dismissed his complaint. ALJ Dec. and Ord. at 17-18.

### III. Instructions on Remand

In remanding the case, the ARB provided the following instructions:

Accordingly, we remand for consideration of whether Nagle was discharged under ARB precedent in *Minne v. Star Air, Inc.*, ARB No. 05-005, ALJ No. 2004-STA-026 (ARB Oct. 31, 2007) and *Klosterman v. E.J. Davies, Inc.*, ARB No. 08-035, ALJ No. 2007-STA-019 (ARB Sept. 30, 2010). In these cases, "discharge" has been interpreted to include the situation where the employment relationship "was ended by one-sided or perhaps mutual assumption by the parties – i.e., by means of behavior from which the parties deduced that the employment relationship was at an end." In the absence of an actual resignation by the employee, "an employer who decides to interpret an employee's actions as a quit or resignation has in fact decided to discharge that employee." *Minne*, ARB No. 05-005, slip op. at 14 (footnotes omitted). The determination on remand may require additional findings of fact as it is unclear from the D. & O. what importance the ALJ gave to the evidence that Nagle called Deavitt to discuss his continued employment, that Deavitt did not call him back, and that, during the OSHA investigation, Deavitt denied that Nagle called him. The ALJ also did not analyze the importance of the evidence that Hubbert told Deavitt that Nagle believed he was fired and that Deavitt took no action when he learned that Nagle believed he was fired. D. & O. at 13.

ARB Dec. and Ord. at 5.

## IV. Supplemental Findings of Fact[6]

In light of the ARB's instructions, additional fact-finding is necessary with respect to the following evidence in the record: (1) that Nagle called Deavitt to discuss his continued employment, that Deavitt did not call him back, and that Deavitt denied during the OSHA investigation that Nagle called him; and (2) that Hubbert told Deavitt that Nagle believed he was fired and that Deavitt took no action when he learned that Nagle believed he had been fired. It also is necessary to make additional findings regarding the origins of the altercation between Nagle and M on December 24, 2008 as such findings are relevant to the issue of causation should I find on remand that Nagle was discharged under ARB precedent. I will address these matters in chronological order.

### A. Who initiated the December 24, 2008 altercation and why?

Nagle testified that the confrontation on the morning of Christmas Eve was initiated when he was approached by M who launched into a verbal assault that included several profane names and a statement that M hated him. Hearing Transcript ("HT") at 63-64, 374-375.[7] Nagle further testified that he initially turned from M and started to walk away, but M followed him, continuing his verbal barrage, whereupon he stopped and told M not to talk to him in that manner. *Id.* at 63-64. According to Nagle, M then came forward and pushed him with both hands, and he responded by pushing M back with one hand. *Id.* at 64. M testified that the altercation began with an argument, that Nagle pushed him, and that he did not push back. *Id.* at 142-143.

The incident was witnessed by two co-workers, both of whom testified at the hearing. Dan Hubbert, a friend of Nagle's who was called as a witness by Unified Turbines, testified that the altercation took place approximately five feet in front of where he was working on the morning of December 24, 2008. HT at 323. Hubbert provided the following account:

> I recall John coming out of the inspection room and [M] following him. Something was said. I'm not sure what [M] said to him. I didn't catch that part. Then they came over to where my bench was, and John got over in his face and said, "Don't talk to me that way." [M] shoved him with two hands. I mean not hard, but he pushed him back. And then John pushed him, pushed [M] back with one hand, his left hand as I remember. And then it kind of broke up, and I think John went down to the welding booth. And I'm not sure if [M] went up front to tell them what happened or where he went.

---

[6] In its reply brief, Unified Turbines acknowledges that the ARB stated that additional findings of fact could be made on remand "but nowhere stated that those already made could be vacated, rescinded or revised." Unified Turbines Rep. Br. at 1. The supplemental findings made herein are limited to matters on which findings were not previously made.

[7] In the initial decision, I noted that while Nagle asserted in his post-hearing that M had stated during their altercation that he hated Nagle, I could not find where Nagle testified to these words in the transcript. ALJ Dec. and Ord. at 9, n.5. As Nagle correctly points out in his brief on remand, this finding was erroneous as the transcript reflects that he did in fact testify that M stated, "I hate you." Nagle Supp. Br. at 8-9, ¶ 29 (citing Hearing Transcript at 375).

*Id.* at 323-24; *see also* JX 3. William Kinsell, who was also called by Unified Turbines, provided this account:

> I was working at my bench, and I noticed out of the corner of my eye and heard some noise, you know, some arguing. And I happened to turn my head and look over, and they were in each other's face, you know, kind of yelling back and forth. And I had to take off my headset, and then I saw John push [M]. And then I thought they were playing around at first, but then I noticed the expressions on the face, and it wasn't playing around.

*Id.* at 306. Kinsell further testified that after Nagle pushed him, M put both of his arms up at shoulder height as he was stepping backward, but he did not actually touch Nagle. *Id.* at 307, 311. Kinsell continued to point out that M is smaller than Nagle and "just a scared individual . . . kind of timid," and he described M's actions as "more of a defensive reaction" to Nagle. *Id.* Kinsell testified that the incident took place approximately four feet from where he was working, and he was sure that Nagle pushed M first, though he did acknowledge that he was working when he first heard the argument and had to look up and turn to observe what was transpiring between Nagle and M. *Id.* at 306, 310-15. He said that the incident was "pretty much over" by the time he removed his headset. *Id.* at 307. Kinsell stated that Nagle then went back to his work area and that M came over to Kinsell's work area and said "they were having an argument about some words that were going back and forth." *Id.* Kinsell testified that M then "went into the front, over by the inspection area." *Id.*

After careful review of the pertinent testimony in light of the entire record. I credit Nagle's testimony that M initiated the confrontation. First, M, while maintaining that he could not remember what he and Nagle were arguing about and denying that he pushed Nagle, did not contradict Nagle's very specific testimony about what was said, by whom and in what sequence. Further, Nagle's account that M was the aggressor is corroborated by Hubbert, who saw M following Nagle and then push Nagle with both hands. To the extent that Kinsell's testimony differs from Hubbert's, I credit Hubbert who witnessed the entire altercation over Kinsell who had to turn, remove his headset, and look up from his work to observe the altercation which was by then already in progress. I also find that M's denial of his role as the aggressor in the incident is not fully credible because he was under the influence of opiates at the time and admitted that his opiate addiction made his thinking and made him more argumentative with his girlfriend. HT at 144, 158. Finally, as discussed below, M was upset with Nagle for complaining to Unified Turbines management about M's substance abuse problems. For these reasons, I find that M initiated the December 24, 2008 confrontation with Nagle and was the aggressor.

As for why he confronted Nagle on the morning of December 24, 2009, M professed at the hearing to have no recollection what the argument was about. HT at 166. For his part, Nagle could not identify the source of M's anger, stating that he "had no interaction with him prior, that day prior to that." *Id.* at 63. However, the circumstantial evidence reveals the likely reason. On December 16, 2008, Nagle reported to Deavitt that he had witnessed M engaged in an apparent drug transaction outside of the Unified Turbines shop. M acknowledged that he had been confronted by Unified Turbines management over Nagle's report that he was selling drugs outside of the shop, and that he was upset by Nagle's allegations. *Id.* at 147-148. M initially

testified that he had learned of Nagle's complaint from Unified Turbines management before Nagle left Unified Turbines in December of 2008, but upon cross-examination by Unified Turbines' attorney, stated that he did not learn of Nagle's complaint until January or February of 2009, after Nagle had left Unified Turbines. *Id.* at 147, 160. M's attempt to shift the date of his awareness of Nagle's complaint to sometime after the December 24, 2008 confrontation is completely undermined by the testimony of Unified Turbines' managers. Deavitt testified that the nature of Nagle's December 16, 2008 allegation was such that it would have been addressed promptly, either that day or the next. *Id.* at 191. Deavitt also confirmed that he and Rick Karnes spoke to M about Nagle's allegation, and he believed that M would have been aware of the fact that Nagle had accused him of selling pills before December 24, 2008. *Id.* at 223-224. Rick Karnes similarly testified that he and Deavitt confronted M about Nagle's December 16, 2008 allegation, most likely that same day or the next day. *Id.* at 289-290. Given the vague and contradictory nature of M's testimony, and noting his admission that his abuse of and addiction to opiates affected his thinking, I give little weight to his sequence of events and instead find that the weight of the evidence establishes that he was confronted by Unified Turbines management with Nagle's allegation of drug dealing prior to the December 24, 2008 altercation. I further find in the absence of evidence of any other reason for M being upset with Nagle on December 24, 2008 that it is far more likely than not that M verbally and physically assaulted Nagle on the morning of December 24, 2008 because he was upset over Nagle's complaint to Unified Turbines management that he had been seen selling drugs outside of the shop.

      B. What is the importance of the evidence that Nagle attempted to call Deavitt and that Deavitt failed to call back or take any other action once he learned from Hubbert that Nagle believed he was fired?

As I previously found, when Nagle called Hubbert on December 27, 2008 and related that he had been fired by Deavitt on December 24th, Hubbert got him to concede that Deavitt had not actually used the word "fired" and recommended that he report to work on Monday or at least call Deavitt or Karnes to discuss his status. ALJ Dec. and Ord. at 11-12. At Hubbert's suggestion, Nagle did place a call to Deavitt's personal mobile phone on December 27th and left a message asking Deavitt to call him back. *Id.* at 12. HT at 70; 205-06; JX 11.[8] While the evidence does not establish that Nagle stated in this message that he wanted to discuss his job, Deavitt admitted that he assumed from the message that Nagle wanted to discuss the situation at work. *Id.* at n.9. The importance of this evidence is that it establishes that Nagle did not resign from his position at Unified Turbines. Rather, it shows that Nagle believed that he had been fired by Deavitt on December 24, 2008 and that Hubbert convinced him during their conversation on the 27th that because Deavitt had not actually used the word "fired," it was in his interest to go back to Unified Turbines or at least call Deavitt or Karnes to clarify his status. Additionally, I find that it is reasonable to infer from this evidence that Nagle did not wish to voluntarily leave or otherwise abandon his job at Unified Turbines in December of 2008. That is, it would make no sense for Nagle to call Deavitt in December 27, 2008 if indeed it was his intention not to return to Unified Turbines because he was dissatisfied with his working conditions there.

---

[8] Nagle testified that he had both Deavitt's and Karnes's mobile phone numbers and that he had several conversations with both men on their mobile phones during 2007 leading up to his being hired by Unified Turbines. HT at 31-34. This testimony was not contradicted by either Deavitt or Karnes.

It is undisputed that Deavitt never returned Nagle's December 27, 2008 call. At the hearing, Deavitt asserted that the message had been left on a non-work day on his "personal cellphone" and that he expected Nagle to come into work the following Monday to discuss things. HT at 205-207, 220-221. As the ARB pointed out, Deavitt stated in an affidavit provided to OSHA that Nagle "never returned to work *or called* to discuss the issues he was having, or to tell his side of the story of the altercation that took place." JX 4 at ¶ 2 (emphasis added). Deavitt attempted to blunt the adverse implications of this misleading statement at the hearing by explaining, "He never called work. He called my personal cellphone. At the time of writing this letter I was talking about work." HT at 221.[9] Further, Deavitt opted to do nothing even after he was informed by Hubbert on December 29th or 30th that Nagle had called Hubbert to express his belief that he was fired, that Hubbert had persuaded Nagle to call, and that Hubbert had witnessed the December 24, 2008 altercation and reported that M had been the aggressor, not Nagle as Deavitt may have initially believed. *Id.* at 202-203, 222-223; 333-334. The importance of this evidence is that Deavitt, despite knowing by December 27, 2008 that Nagle had called him to discuss the December 24, 2008 incident and the status of his employment and despite his subsequent knowledge on December 29th or 30th that Nagle had not been the aggressor and believed that he had been fired, decided to do nothing and let events play out into a scenario where it appeared that Nagle had abandoned his job at Unified Turbines. I further find that Deavitt's misleading statement in his OSHA affidavit that Nagle had never called after the December 24, 2008 incident constituted an attempt to withhold evidence that ran counter to Unified Turbines' position that Nagle had voluntarily abandoned his job. Moreover, Deavitt's efforts to build a circumstantial case that Nagle abandoned his job supports the finding that there was no actual resignation.[10]

## V. Supplemental Analysis and Conclusions

### A. What did Nagle do that was protected by AIR 21 and when?

Upon review of the arguments offered by the parties on remand, I find that it is necessary as a preliminary matter to clarify my prior conclusions, which were affirmed by the ARB, regarding the nature and timing of Nagle's protected activity. In this regard, Unified Turbines asserts in its brief on remand that I previously found that Nagle's protected activity occurred in late September or early October of 2008. Unified Turbines Supp. Br. at 5. Unified Turbines further asserts that I previously found that "Nagle's allegation in December of 2008 that his co-worker was illegally selling prescription drugs 'is not completely reliable' and concluded it was *not* protected activity." *Id.* at 5-6 (italics in original; citations to the record omitted). This argument reflects a misreading of my initial decision.

At the outset of my analysis of the protected activity element of Nagle's complaint, I noted that "Nagle contends that he engaged in three acts protected by [AIR 21]: (1) informing his employers at Unified Turbines Turbine that he believed that M was abusing his prescription medication; (2) informing his employers that M appeared to have an interest in K's prescription

---

[9] The statement that Nagle did not call was made in a sworn affidavit, not a letter. JX 4.

[10] It is noted that Deavitt confirmed in his OSHA affidavit that Nagle "did not inform us that he was quitting." JX 4 at ¶ 2.

medication; and (3) informing his employers that he had seen M selling narcotics while at work." ALJ Dec. and Ord. at 14. After discussing the pertinent FAA regulations relating to use of prohibited drugs in regulated workplaces, I found that "a reasonable person with Nagle's training and experience could believe that M's ongoing abuse of drugs and deteriorating performance was in violation of FAA regulations," and I concluded that "Nagle engaged in activity protected by the [AIR 21] when he provided information to his employers at Unified Turbines that M was abusing his prescription narcotic medication on the job." *Id.* at 15. In a footnote to this conclusion, I held that "Nagle's report to the Winooski Police on December 16, 2008, was not protected . . . because the report was not made to the federal government or at the direction of a federal entity." *Id.* at n. 11. While I stated earlier in the decision that discrepancies between Nagle's testimony at hearing and the police narrative of his complaint led to the conclusion that his testimony regarding the particulars of M's behavior was not completely reliable, *Id.* at n. 3, I did not, as implied by Unified Turbines, find that his action in reporting to Unified Turbines management on December 16, 2008 that he had observed M engaged in what appeared to be an illicit drug transaction outside the shop was unprotected. Rather, Nagle's report to Unified Turbines on December 16, 2008 was one of the three separate, specific communications to Unified Turbines management regarding M's suspected abuse of prescription medication that were determined to be protected under AIR 21. I adhere to this conclusion, and I also reject Unified Turbines' argument in its post-hearing memorandum that Nagle's complaint on December 16th was unprotected because it concerned a *sale* of drugs outside of work and not *abuse* of drugs on the job. *See* Unified Turbines Post-Hearing Memo. at 7. That is, the record shows that Nagle brought M's conduct on December 16[th] to management's attention because he further believed that it was further evidence that M had a "problem" with abusing prescription pain medication that was impacting on his performance. HT at 60.

B. Was Nagle discharged under ARB Precedent?

The ARB has instructed the ALJ to determine whether Nagle was discharged under the precedent established in *Minne* and *Klosterman* cases where "discharge" was interpreted to include a situation where the employment relationship "was ended by one-sided or perhaps mutual assumption by the parties – i.e., by means of behavior from which the parties deduced that the employment relationship was at an end." ARB Dec. and Ord. at 5 (quoting *Minne*, ARB No. 05-005, slip op. at 13). The ARB held in *Minne* that in the absence of an actual resignation by an employee, "an employer who decides to interpret an employee's actions as a quit or resignation has in fact decided to discharge that employee." *Minne*, ARB No. 05-005, slip op. at 14 (footnotes omitted).

In its brief on remand, Unified Turbines points out that the *Minne* and *Klosterman* cases involved protected refusals to drive unsafe vehicles under section 405 of the Surface Transportation Act of 1982 (the "STAA"), as amended, 49 U.S.C. § 31105 (formerly 49 U.S.C. § 2305) where issues were raised regarding whether the employees had engaged in protected refusals to drive or simply quit. Unified Turbines Supp. Br. at 1-2. Unified Turbines notes that in these STAA cases the employees were given ultimatums to either "drive or be fired" or "drive or go home" by employers who refused to address the employees' safety concerns and instead chose to treat their refusals to drive unsafe vehicles as voluntary quits. *Id.* at 3. Building on these points, Unified Turbines argues that the instant case is distinguishable from *Minne* and

*Klosterman* because AIR 21 does not contain a protected "refusal to work" provision comparable to the STAA, there was no "work or be fired" edict issued to Nagle and because Nagle's failure to report to work on December 29, 2008 was "collateral" to his protected activity and not a "protected refusal to work." *Id.* at 2-3.[11] Nagle responds that these arguments "<u>would have been good . . . had the ARB not already ruled that [the *Minne* and *Klosterman* precedent] . . . is applicable</u>. Nagle Rep. Br. At 3 (underlining in original). I agree. "No rule of American jurisprudence is better established than the salutary one which requires a lower court to carry out faithfully the express mandate of its appellate superior." *Slotkin, by Slotkin v. Citizens Cas. Co. of New York*, 698 F.2d 154, 155 (2d Cir. 1983) (citing *Kansas City Southern Ry. Co. v. Guardian Trust Co.*, 281 U.S. 1, 11 (1930); *Ex parte Union Steamboat Co.*, 178 U.S. 317, 318-19 (1900); *Ex parte Sibbald v. United States*, 37 U.S. 488, 492, (1838)) . The ARB very clearly directed the ALJ to determine on remand whether Nagle was discharged under the *Minne* and *Klosterman* precedent. If the ARB believed this precedent inapplicable as a matter of law in an AIR 21 case, it would not have ordered the ALJ to follow it on remand. Moreover, The ARB effectively rejected Unified Turbines' "apples and oranges" argument about the STAA and AIR 21, stating that "[t]he statutory scheme established by AIR 21 essentially mirrors the protective provisions of the STAA (as well as other whistleblower statutes) and jurisprudence developed under that statute should be applied to this case." ARB Dec. and Ord. at 5 (citing *Sylvester v. Paraxel Int'l LLC*, ARB No. 07-123, ALJ Nos. 2007-SOX-039, 2007-SOX-042, slip op. at 35 (ARB May 25, 2011) (the Board interprets whistleblower statutes in a parallel manner)). Therefore, the ALJ is bound to faithfully determine whether Nagle was terminated under the precedent deemed applicable by the ARB.

While I previously concluded that Nagle's failure to report for work on December 29, 2008 was "objectively unreasonable" under the circumstances and constructively constituted a voluntary quit under Vermont unemployment law, the ARB reversed this conclusion as legally erroneous. There is no evidence that Nagle actually resigned. He simply failed to report to work after being sent home on December 24th and after not receiving a response to the mobile phone message that he left for Deavitt on December 27th. Deavitt, on the other hand, chose not to return Nagle's December 27th call despite admitting that he assumed that Nagle wanted to discuss the situation at work, and he also chose not to act after Hubbert informed him on the 29th or 30th that Nagle thought he'd been fired and that M was the aggressor in the December 24th altercation. Instead, Deavitt chose to interpret Nagle's failure to report for work as a voluntary quit, and he mislead OSHA in his affidavit when he stated, in an effort to bolster Unified Turbines' "voluntary quit" defense, that Nagle had never called Unified Turbines after December 24, 2008. Further, Deavitt admitted on cross-examination that he had called another employee in accordance with his protocol when that employee had failed to show up for work before concluding, when the employee did not call back, that the employee had abandoned his job. HT at 224-225. On these facts, I conclude that Unified Turbines, having departed from its normal protocol of calling an absent employee and deciding instead to interpret Nagle's failure to report for work on December 29th as a voluntary quit in the absence of an actual resignation, decided to

---

[11] While Unified Turbines is correct that AIR 21 does not contain a specific "protected refusal to drive" provision comparable to the STAA, the ARB has held that "a pilot's refusal to fly when he or she reasonably believes that an aircraft is unsafe is fully consistent with the purposes of AIR 21." *Sitts v. COMAIR, Inc.*, ARB No. 09-130, ALJ No. 2008-AIR-7, slip op. at 16 (ARB May 31, 2011). However, I need not dwell on this point as Nagle has not claimed that his failure to return to Unified Turbines on December 29, 2008 was protected under AIR 21.

discharge Nagle under the ARB precedent articulated in *Minne* and *Klosterman*.[12] Since discharging an employee for engaging in protected activity is expressly prohibited by AIR 21, 49 U.S.C.A. § 42121(a), I further conclude that Nagle has met his burden of proving by a preponderance of the evidence that he suffered an adverse employment action. *Douglas v. Skywest Airlines, Inc.*, ARB Nos. 08-070, 08-074, ALJ No. 2006-AIR-14, slip op. at 11 (ARB Sept. 30, 2009) ("Termination of employment is an adverse action.").[13]

C. Was Nagle's protected activity a "contributing factor" to his discharge?

Having established the first three elements of his claim (*i.e.*, that (1) he engaged in activity protected by AIR 21, (2) Unified Turbines knew of his protected activity, and (3) he suffered an adverse employment action), Nagle must next "prove by a preponderance of the evidence that his protected activity was a contributing factor to the alleged adverse action." ARB Dec. and Ord. at 4 (citing 49 U.S.C.A. § 42121(b)(2)(B)(i); 29 C.F.R. § 1979.109(a)); *see also Clark v. Pace Airlines, Inc.*, ARB No. 04-150, ALJ No. 2003-AIR-028, slip op. at 11 (ARB Nov. 30, 2006). A contributing factor is "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Allen v. Stewart Enterprises, Inc.*, ARB No. 06-081, ALJ Nos. 2004-SOX-60-62, slip op. at 17 (ARB July 27, 2006) (quoting *Marano v. Department of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993) (interpreting the Whistleblower Protection Act, 5 U.S.C.A. § 1221(e)(1)).[14] The contributing factor standard was

---

[12] The determination that Unified Turbines discharged Nagle when Deavitt decided to interpret Nagle's failure to report to work on December 29, 2008 as a voluntary quit in the absence of an actual resignation is based on an application of the ARB's *Minne* holding as it was articulated in the ARB's decision and order in this case. In this regard, the ARB cited its 2007 opinion in *Minne* for the proposition that "[i]n the absence of an actual resignation by the employee, 'an employer who decides to interpret an employee's actions as a quit or resignation has in fact decided to discharge that employee.'" ARB Dec. and Ord. at 5 (quoting *Minne*, ARB No. 05-005, slip op. at 14). However, in a subsequent decision in *Minne*, the ARB stated its prior holding a little differently: "An employer who decides to interpret an employee's protected activity as a resignation has in fact decided to discharge that employee." *Minne v. Star Air, Inc.*, ARB Nos. 09-066, 09-082, ALJ No. 2004-STA-26, slip op. at 8 (underlining supplied). If the *Minne* precedent were to be strictly limited to those cases where an employer elects to construe an employee's protected activity, *e.g.*, a protected refusal to drive under the STAA, as a voluntary quit, finding a discharge on the facts of this case would be problematic since there is no claim that Nagle's failure to report to work on December 29, 2008 was a protected by AIR 21. Indeed, is thrust of Unified Turbines' argument that the ARB's STAA precedent is inapplicable to this case. However, for the reasons discussed above, I find that this argument is foreclosed by the ARB's clear mandate that the *Minne* and *Klosterman* precedents be applied to the facts of the instant case.

[13] In concluding that Nagle met his burden of proving the adverse action element of his claim under ARB precedent, consideration was given to Unified Turbines' argument that the ARB's decision in *Smith v. Jordan Carriers*, ARB No. 05-042, ALJ No. 2004-STA-47 (ARB Aug. 26, 2006) does not support a proposition that an employer's "erroneous assumption that an employee has quit is alone enough *under any circumstances*" to establish that the employee was discharged. Unified Turbines Rep. Br. at 2 (italics in original). However, *Smith* is distinguishable because the ALJ in that case found that the complainant walked off the job because he was upset with another employee's misconduct, not because of protected safety-related concerns, and that he never subsequently contacted the employer about his status or returned to work. *See Smith*, ALJ No. 2004-STA-47, slip op. at 18-20 (ALJ Dec. 16, 2004). Unlike, *Smith*, Nagle did not simply walk off the job for reasons unrelated to any protected activity. Rather, he was ordered to go home by Deavitt, and he thereafter attempted to call Deavitt to discuss his status.

[14] *Allen* involved the employee protection provisions of the Corporate and Criminal Fraud Accountability Act (known by its popular title as the "Sarbanes-Oxley Act"), 18 U.S.C. § 1514A(a)-(d) which incorporate the evidentiary burdens established by AIR 21. *Allen*, slip op. at 9; 18 U.S.C. § 1514A(b)(2)(C).

- 13 -

"intended to overrule existing case law, which requires a whistleblower to prove that her protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action." *Id.* Further, "[p]roof of 'retaliatory motive' is not necessary to a determination of causation under the contributing factor standard. *Menendez v. Halliburton, Inc.*, ARB Nos. 09-002, 09-003, ALJ No. 2007-SOX-5, slip op. at 31 (ARB Sept. 13, 2011) (quoting *Marano*, 2 F.3d at 1141)).

Nagle engaged in AIR 21 protected activity on December 16, 2008 when he reported M's suspected drug dealing outside the shop to Unified Turbines management, and he was discharged on December 29, 2008 when he failed to report to work. While the close temporal proximity between Nagle's final protected action and his discharge are suggestive of a causal relationship, consideration must be given to two significant intervening events, neither of which directly involved any activity protected by AIR 21: (1) the altercation with M on December 24, 2008 and (2) Nagle's failure to report for work on December 29, 2008. *See Clark v. Pace Airlines, Inc.*, ARB No. 04-150, ALJ No. 2003-AIR-28, slip op. at 12-13 (ARB Nov. 30, 2006) (retaliatory motive may be inferred when an adverse action closely follows protected activity, "[b]ut if an intervening event that independently could have caused the adverse action separates the protected activity and the adverse action, the inference of causation is compromised."). Nagle makes no claim that he was engaged in protected activity during his altercation with M or when he didn't report to work. However, in light of my finding on remand that M started the altercation because he was upset that Nagle had reported his suspected drug dealing to management, it cannot be concluded that there is no relationship between Nagle's protected activity and these subsequent events. That is, if Nagle had not engaged in his protected activity on December 16, 2008 by reporting that he had observed M engaged in an apparent drug transaction outside the shop, it is far more likely than not that the altercation on the 24th would not have occurred and, by logical extension, that Nagle would not have been sent home and would not have failed to report for work on December 29, 2008 thinking that he'd been fired when Deavitt declined to return his telephone call. Further, it is significant that Unified Turbines provided a crucial link in the chain of causation when it informed M that Nagle was the source of the complaint that he had been observed in an illicit drug transaction outside the shop. Unified Turbines' motives in making this disclosure are irrelevant since the focus is on the effect of an employer's action, not its motivation. *Menendez*, slip op. at 31-32 (holding that an employer's breach of a whistleblower's confidentiality, "however well meaning, nonetheless demonstrates a lack of understanding of the foreseeable consequences and does not absolve [the employer] of responsibility" and that '[t]he ALJ erred as a matter of law in deciding that lack of retaliatory motivation precluded a finding of causation.").[15] Here, the proximate and foreseeable effect of Unified Turbines' action in informing M of Nagle's protected complaint was the December 24[th] altercation for which Nagle was erroneously blamed and which precipitated a series of events which began with Nagle being angrily ordered by Deavitt to leave the premises and concluded with Deavitt's decision to not return Nagle's call and instead let Nagle believe that he'd been fired. Clearly, none of this would have occurred had Nagle not engaged in protected activity and had Unified Turbines not disclosed his protected activity to M. On these facts, I conclude that Nagle has proved by a preponderance of the evidence that his protected activity under AIR 21 was a contributing factor to his discharge since it tended to affect the outcome which was

---

[15] Unified Turbines' motives in revealing Nagle's identity as the source of the drug abuse complaints to M were not addressed at the hearing.

Unified Turbines' decision not to return Nagle's telephone call and instead interpret his absence from work on December 29, 2008 as a voluntary quit.

> D. Has Unified Turbines demonstrated by clear and convincing evidence that Nagle would have been discharged in the absence of his protected activity?

Because Nagle has established the elements necessary to prove his claim that Unified Turbines violated AIR 21, he is entitled to relief unless Unified Turbines demonstrates "by clear and convincing evidence" that it would have taken the same unfavorable action in the absence of his protected activity. ARB Dec. and Ord. at 4. The ARB has defined a respondent's evidentiary burden at this stage of an AIR 21 case as follows:

> Clear and convincing evidence denotes a conclusive demonstration; it indicates "that the thing to be proved is highly probable or reasonably certain." This standard of proof is more rigorous than the preponderance-of-the-evidence standard but lower than clear than the beyond-a-reasonable-doubt criterion of criminal cases. Thus, clear and convincing evidence that an employer would have fired the employee absent protected activity overcomes the fact that an employee's protected activity played a role in the employer's adverse action and relieves the employer of liability

*Clark v. Airborne, Inc.*, ARB No. 08-133, ALJ No. 2005-AIR-27, slip op. at 9-10 (ARB Sept. 30, 2010) (footnotes omitted; internal quotation marks in original).

There is ample evidence in the record that Nagle had a difficult personality, that he missed significant time from work due to his child care responsibilities, and that he repeatedly voiced dissatisfaction with his pay at Unified Turbines and even stated that he was thinking about quitting. However, there is no evidence or even a claim that he was ever counseled or warned about any of these behaviors or that that Unified Turbines had any plan to terminate his employment prior to the events that unfolded during the final two weeks in December of 2008. The absence of any evidence that Nagle was warned or otherwise placed on notice that his attendance and / or attitude were problematic militates against a finding that that Unified Turbines proved by clear and convincing evidence that it would have terminated his employment for these reasons. *See Furland v. v. American Airlines, Inc.*, ARB Nos. 09-102, 10-130, ALJ No. 2008-AIR-11, slip op. at 9-10 (ARB July 27, 2011); *Douglas v. Skywest Airlines, Inc.*, ARB Nos. 08-070, 08-074, ALJ No. 2006-AIR-14, slip op. at 17, n. 108 (ARB Sept. 30, 2009) (employer's burden is to prove by clear and convincing evidence that it "would have," not "might have" or "could have" terminated employment for reasons unrelated to protected activity). There also is the matter of Nagle's altercation with M, but Deavitt testified that neither Nagle nor M was disciplined for this incident. HT at 210, 224. Moreover, as the evidence establishes that M initiated the confrontation and was the aggressor, facts which Unified Turbines knew by December 29 or 30, 2008, there was no legitimate basis for taking any action against Nagle for his role in the incident. Accordingly, I conclude that Unified Turbines has not demonstrated by clear and convincing evidence on this record that Nagle's employment would have been terminated in the absence of his protected activity.

- 15 -

## VI. Remedy

When an AIR 21 complainant establishes retaliation for protected whistleblowing activities, the Secretary of Labor shall order the employer to "(i) take affirmative action to abate the violation; (ii) reinstate the complainant to his or her former position together with the compensation (including back pay) and restore the terms, conditions, and privileges associated with his or her employment; and (iii) provide compensatory damages." *Luder v. Continental Airlines, Inc.*, ARB No. 10-026, ALJ No. 2008-AIR-9, slip op. at 13 (ARB Jan. 31, 2012) (footnotes omitted). A successful complainant is also entitled to "all costs and expenses (including attorney's and expert witness fees) reasonably incurred" in bringing the complaint. *Id.*

### A. Reinstatement

Subsequent to his discharge from Unified Turbines, Nagle eventually found another job, and he has not asked to be reinstated to his former position at Unified Turbines. Instead, he has requested make-whole relief in the form of lost pay plus interest, compensatory damages and attorney's fees and litigation costs. Nagle Proposed Findings of Fact and Conclusions of Law at 31-32, Nagle Supp. Br. at 30-31. Nagle's silence on reinstatement is not dispositive since reinstatement is an "automatic remedy" under AIR 21 "except where impossible or impractical." *Clemmons v. Ameristar Airways, Inc.*, ARB No. 08-067, ALJ No. 2004-AIR-00011, slip op. at 12 (ARB May 26, 2010), *aff'd in part, rev'd in part sub nom. Ameristar Airways, Inc. v. Administrative Review Bd., U.S. Dept. of Labor*, 650 F.3d 562 (5th Cir. 2011); *see also Dale v. Step 1 Stairworks, Inc.*, ARB No. 04-003, ALJ No. 2002-STA-00030, slip op. at 4 (ARB Mar. 31, 2005) (ALJ erred in accepting at face value a statement from the complainant that he was not seeking reinstatement). While it might be uncomfortable, at least initially, for Nagle to return to Unified Turbines, there is no evidence or claim that reinstatement would be impossible or impractical. Therefore, it would constitute legal error to not order Unified Turbines to make a *bona fide*, unconditional offer of reinstatement to Nagle. *Id.* Nagle may well elect not to accept the offer, but it nonetheless must be made.

### B. Back Pay

"The purpose of a back-pay award is to return the wronged employee to the position he would have been in had his employer not retaliated against him; calculations of the amount due must be reasonable and supported by the evidence." *Clemmons*, slip op. at 12. Nagle submitted evidence that he lost $25,065.00 in income during 2009 and an additional $943.50 from January through April of 2010 based on the $1.50 hourly pay rate differential between his job at Unified Turbines and his current employment. Nagle Supp. Br. at 30-31. Unified Turbines has not challenged Nagle's lost wages evidence or introduced any contrary evidence. As of May 5, 2010, Nagle obtained a new job which paid him $17.25 per hour which is $.25 per hour less than his pre-discharge rate of pay at Unified Turbines. *Id.*, Affidavit of John Nagle (May 16, 2010) at ¶ 6. Nagle further stated in this affidavit that his pay rate was due to increase to $17.50 per hour after 90 days from May 5, 2010. *Id.* This represents an additional 13-week period of lost pay at the rate of $.25 x 37 x 13 which equals $120.25. Thus, I find that Nagle's total wage loss from

January 2009 through August 5, 2010 was $26,128.75.[16]   Accordingly, I will order Unified Turbines to pay Nagle $26,128.75 in back pay plus pre- and post-judgment interest calculated pursuant to 26 U.S.C.A. § 6621(a)(2) and compounded quarterly. *Clemmons*, slip op. at 15; *Doyle v. Hydro Nuclear Servs.*, ARB Nos. 99-041, 99-042, 00-012, ALJ No. 1989-ERA-22, slip op. at 17-21 (ARB May 17, 2000).[17]

C. Compensatory Damages

Nagle seeks compensatory damages for "pain and suffering" that he endured as a result of losing his job at Unified Turbines. Nagle Supp. Br. at 31. His evidence of damages comes from his testimony at the hearing. Specifically, he testified that after being discharged from Unified Turbines, he had no income until he received welfare benefits in February of 2009, followed by unemployment benefits in March. HT at 76-77. He had only "a couple hundred dollars" in savings and no credit cards so he had to rely on aid from the "Salvation Army, Community Action Group, Catholic Charities, mostly every public assistance thing out there I was hitting and knocking on doors trying to get a job." *Id.* at 77-78. He fell behind in his rent and received an eviction notice, though he ultimately was able to avoid eviction by talking to his landlord who was willing to work with him. *Id.* at 78. He described this period as "very stressful." *Id.* Nagle testified that he is divorced with sole custody of his daughter. *Id.* at 78-79. He ex-wife has been ordered to pay child support, but he has never received any payments as she has apparently evaded the child support enforcement authorities. *Id.* at 79. Nagle testified that his daughter suffers from post-traumatic stress disorder ("PTSD") related to abuse that she suffered at the hands of her mother when she was between two and three years old. *Id.* at 80. Because of his daughter's condition, Nagle stated that she is under the care of a psychologist, and he has tried to provide her with stability and a consistent routine. *Id.* at 82-83. He further testified that when he lost his job and health insurance at Unified Turbines, his daughter had to stop counseling for a period of time:

> I lost insurance. I no longer had it. I still don't have insurance so that [counseling] stopped. So I had to find different avenues to approach and get her back on track. So it affected her school work, because she is kind of – it's hard to hide that situation, to know that Dad's not going to work today. So it added stress to her, which caused her behaviors to jump around at school.

---

[16] It is noted that Nagle has requested to reopen the record to admit updated testimony regarding his income and benefits since leaving Unified Turbines. Nagle Supp. Br. at 31. The applicable rule states that "[o]nce the record is closed, no additional evidence shall be accepted into the record except upon a showing that new and material evidence has become available which was not readily available prior to the closing of the record." 29 C.F.R. § 18.54(c). *See also Douglas v. Skywest Airlines, Inc.*, ARB Nos. 08-070, 08-074, ALJ No. 2006-AIR-14, slip op. at 19 (ARB Sept. 30, 2009); *Shields v. James E. Owen Trucking, Inc.*, ARB No. 08-021, ALJ No. 2007-STA-22, slip op. at 7 (ARB Nov. 30, 2009). Reopening might be warranted if, for example, Nagle did not receive the scheduled pay increase in August of 2010 or if he subsequently lost his replacement employment. However, as no such claim has been made, I find that sufficient grounds for reopening the record have not been demonstrated.

[17] The ARB's decision in *Doyle* contains specific instructions on how to calculate the interest awards which are incorporated herein.

*Id.* at 84-85. He had to stop his daughter's therapy because he was could not afford the cost until he was able to find a government-subsidized health insurance plan for his daughter. *Id.* at 86-87. As for the impact of job loss on him, Nagle testified,

> It was very stressful. It was very hard trying to find a job around here. It's a small town. The amount of corporations and the economy itself is limited. I was just persistent enough to get a job. And thank God I did.

*Id.* at 85. Nagle has not made a specific monetary demand for compensatory damages.

Compensatory or non-economic damages are designed to compensate whistleblowers not only for direct pecuniary loss, but also for such harms as loss of reputation, personal humiliation, mental anguish, and emotional distress. *Evans v. Miami Valley Hospital,* ARB Nos. 07-118, 07-121, ALJ No. 2006-AIR-22, slip op. at 20 (ARB June 30, 2009) (footnotes omitted). While a "key step" in determining the appropriate amount of such damages is a comparison with awards made in similar cases, ultimately the determination is "subjective based on the facts and circumstances of each claim." *Id.* at 20, 22. To recover compensatory damages for mental suffering or emotional anguish, a complainant must show by a preponderance of the evidence that the unfavorable personnel action caused the harm. *Id.* The ARB recently elaborated on the nature of a complainant's burden of proving damages in *Luder v. Continental Airlines, Inc.,* ARB No. 10-026, ALJ No. 2008-AIR-9 (ARB Jan. 31, 2012). In that case, the ARB stated,

> A complainant's burden of proof is no different when the claim is for lost wages based on the complainant's medical or psychological condition. Thus, the circumstances of the case and lay testimony about physical or mental consequences of retaliatory action may support such awards. The ARB has held that while the testimony of medical or psychiatric experts "can strengthen the case for entitlement to compensatory damages, it is not required." The ARB has affirmed compensatory damage awards for emotional distress, even absent medical evidence, where the lay witness statements are "credible" and "unrefuted."

*Luder,* slip op. at 16 (footnotes omitted, internal quotation marks in original). However, the Board went in *Luder* to clarify its precedent with respect to cases where damages are sought for a "specific and diagnosable medical condition." *Id.* at 17. With respect to such claims, the ARB stated,

> However, in other cases, such as *Gutierrez* [*v. Regents of the Univ. of Cal.,* ARB No. 99-116, ALJ No. 1998-ERA-019 (ARB Nov. 13, 2002)] for example, where the claim for an award of damages for emotional stress is based solely on the complainant's testimony that he suffered a specific and diagnosable medical condition, the ARB has reasonably required "medical or other competent evidence" showing that the complainant suffered from the medical condition and that it "was causally related to the unfavorable personnel actions" the respondent took. Absent such evidence, the ARB held in *Gutierrez* that complainant "failed

- 18 -

to meet his burden of proving a causally-related condition, even under the generous evidentiary standards of 29 C.F.R. § 24.6(e)."

*Id.* at 17 (internal quotation marks in original).

Here, Nagle has made no claim that his discharge from Unified Turbines caused him to suffer any specific and diagnosable medical condition, but he has alleged that his daughter's PTSD, which is a specific and diagnosable medical condition, was exacerbated by his job loss. Under *Luder,* Nagle can prevail on his claim for damages related to the stress and difficulties that he and his daughter experienced as a result of his job loss based on lay testimony that is credible and unrefuted, but he cannot meet his burden with respect to any claim for damages based on an alleged exacerbation of his daughter's PTSD without medical or other competent evidence. With this guidance in mind, I will now turn to an assessment of compensatory damages.

First to be considered is the amount of damages awarded in similar cases. In *Evans,* the ARB affirmed an ALJ's award of $100,000.00 in compensatory, non-economic damages based on the credible and unrefuted testimony of the complainant and his wife. Slip op. at 22. The ARB summarized the lay testimony in Evans as follows:

> Evans testified that his firing took his confidence away—he was accused of being afraid to fly, of being too nitpicky about the aircraft, and that had made him second-guess his judgment, even now. He added that the biggest upset was that he could no longer provide for his family—his wife trusted him to make a living and did not renew her teaching contract when their son was born in February 2005 after twenty years of waiting. Evans stated that he and his wife were in and out of therapy together and individually, that they were still in family counseling, and that a doctor prescribed Paxil for depression and anxiety.

> Evans's wife, Tamyka, testified that Evans "loves flying" and CareFlight was his "dream job" which he took to avoid the long commute he had with his previous employer. She added that the termination "devastated" Evans, who came home, told her about it, and basically withdrew from their lives, just "shut down." Mrs. Evans added that for three months her husband was "unavailable, both physically, emotionally, in all facets of our life." She had planned to be a stay-at-home mother with their son, Ryan, but after Evans's firing she had to return to teaching. Mrs. Evans stated that Evans was better but would never be the same because the termination took away his integrity, what he believed in, and "drained him."

*Id.* at 136 (footnotes omitted, internal quotation marks in original). In *Negron v. Vieques Air Link, Inc.,* ARB No. 04-021, ALJ No. 2003-AIR-10 (ARB Dec. 30, 2004), *aff'd sub nom. Vieques Air Link, Inc. v. U.S. Dept. of Labor,* 437 F.3d 102 (1st Cir. 2006), a retaliatory transfer / constructive discharge case, the ARB affirmed an ALJ's compensatory damage award of $50,000, holding that substantial evidence supported the award because the Complainant had credibly testified that he had two young children including an infant and that, among other hardships, he was forced to sell his automobiles and deplete his savings. Slip op. at 9.

The *Evans* and *Negron* cases suggest that a compensation award in the range of $50,000.00 to $100,000.00 for non-economic damages is appropriate where credible lay testimony is introduced to show that a complainant and his or her family suffered financial and emotional stress as a result of an employment termination in violation of the employee protection provisions of AIR 21. In this case, I find Nagle's unrefuted testimony regarding the family impact of his job loss to be fully credible. He impressed me as a caring parent, and his devotion to his minor child's welfare is corroborated by the time he took off from Unified Turbines to attend to her academic and mental health needs. In my view, the impact of Nagle's loss of employment is comparable to the situations in *Evans* and *Negron*. There is, however, a difference as well. That is, Nagle's failure to do anything to preserve his employment at unified Turbines other than place a call to Deavitt on December 27, 2008, albeit not legally determinative of whether he was discharged under ARB precedent, allowed Unified Turbines and the Vermont Department of Employment and Training to interpret his actions as a voluntary quit which disqualified him from receiving unemployment benefits for a period of time. *See* 21 V.S.A. § 1344(a)(2)(A); JX 4 at ¶ 2. Consequently, I find it reasonable to award compensatory damages in the amount of $50,000.00, which represents the lower end of the range, in recognition of Nagle's contributory role in his own misfortunes.

D. Attorney's Fees

Nagle is entitled to attorney's fees and litigation costs. 49 U.S.C.A. § 42121(b)(3)(B)(iii); 29 C.F.R. § 1979.109(b). Accordingly, Nagle will be permitted to file an application for attorney's fees and costs, and Unified Turbines will be allowed an opportunity to file any objections to the requested fees and costs.

## VII. Order

Based on the foregoing findings and conclusions, the following order is entered:

(1)     Respondent Unified Turbines shall make a *bona fide*, unconditional offer to reinstate Complainant John Nagle to his former position together with the compensation, terms, conditions, and privileges associated with his employment that he would have enjoyed but for his termination on December 29, 2008;

(2)     Respondent Unified Turbines shall remit to Complainant John Nagle back pay in the amount of **$26,128.75** plus pre- and post-judgment interest calculated pursuant to 26 U.S.C. § 6621(a)(2) and compounded quarterly;

(3)     Respondent Unified Turbines shall pay Complainant John Nagle compensatory damages in the amount of **$50,000.00**; and

(4)     Complainant's attorney shall have **30 days** from the date of this order to file a fully supported petition for fees and litigation costs. Should Respondent object to any fees or costs requested in the petition, the parties' attorneys shall discuss and attempt to informally resolve the objections. Any agreement reached between the parties as a result

of these discussions shall be filed with the ALJ in the form of a stipulation. In the event that the parties are unable to resolve all issues relating to the requested fees and costs, Respondent's objections shall be filed not later than **30 days** from the receipt of the fee petition. **The objections must be accompanied by a certification that the objecting party made a good faith effort to resolve the issues with Complainant's attorney prior to the filing of the objections.**

**SO ORDERED.**



Digitally signed by Daniel F. Sutton
DN: CN=Daniel F. Sutton,
OU=Administrative Law Judge,
O=Office of Administrative Law
Judges, L=Boston, S=MA, C=US
Location: Boston MA

**DANIEL F. SUTTON**
Senior Administrative Law Judge

Boston, Massachusetts

## NOTICE OF APPEAL RIGHTS

To appeal, you must file a Petition for Review ("Petition") with the Administrative Review Board ("Board") **within ten (10) business days of the date of issuance of the administrative law judge's decision**. The Board's address is: Administrative Review Board, U.S. Department of Labor, Suite S-5220, 200 Constitution Avenue, NW, Washington DC 20210. Your Petition is considered filed on the date of its postmark, facsimile transmittal, or e-mail communication; but if you file it in person, by hand-delivery or other means, it is filed when the Board receives it. *See* 29 C.F.R. § 1979.110(a). In addition to filing your Petition for Review with the Board at the foregoing address, an electronic copy of the Petition may be filed by e-mail with the Board, to the attention of the Clerk of the Board, at the following e-mail address: ARB-Correspondence@dol.gov. Your Petition must specifically identify the findings, conclusions or orders to which you object. You waive any objections you do not raise specifically. *See* 29 C.F.R. § 1979.110(a).

At the time you file the Petition with the Board, you must serve it on all parties as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges, 800 K Street, NW, Suite 400-North, Washington, DC 20001-8002. You must also serve the Assistant Secretary, Occupational Safety and Health Administration and the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, DC 20210. *See* 29 C.F.R. § 1979.110(a).

If no Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor pursuant to 29 C.F.R. § 1979.110. Even if a Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor unless the Board issues an order within thirty (30) days of the date the Petition is filed notifying the parties that it has accepted the case for review. *See* 29 C.F.R. §§ 1979.109(c) and 1979.110(a) and (b).

**The preliminary order of reinstatement is effective immediately upon receipt of the decision by the Respondent and is not stayed by the filing of a petition for review by the Administrative Review Board.** 29 C.F.R. § 1979.109(c). If a case is accepted for review, the decision of the administrative law judge is inoperative unless and until the Board issues an order adopting the decision, except that a preliminary order of reinstatement shall be effective while review is conducted by the Board. 29 C.F.R. § 1979.110(b).

## SERVICE SHEET

Case Name: NAGLE_JOHN_v_UNIFIED_TURBINES_INC_

Case Number: **2009AIR00024**

Document Title: **DECISION AND ORDER ON REMAND**

I hereby certify that a copy of the above-referenced document was sent to the following this 25th day of October, 2012:

 Digitally signed by IRENE CHAN
DN: CN=IRENE CHAN, OU=LEGAL
ASSISTANT, O=Office of Administrative Law
Judges, L=Boston, S=MA, C=US
Location: Boston MA

**IRENE CHAN**
LEGAL ASSISTANT

Regional Administrator
Region 1
U. S. Department of Labor, OSHA
Room E340
JFK Federal Building
BOSTON MA 02203
　　　*{Hard Copy - Regular Mail}*

Regional Solicitor
U. S. Department of Labor
JFK Federal Building
25 New Sudbury Street, Room E-375
BOSTON MA 02203
　　　*{Hard Copy - Regular Mail}*

Associate Solicitor
Division of Fair Labor Standards
U. S. Department of Labor
Room N-2716, FPB
200 Constitution Ave., N.W.
WASHINGTON DC 20210
　　　*{Hard Copy - Regular Mail}*

Federal Aviation Administration
Attn: Mr. Gene Kirkendall, Room 831
Whistleblower Protection Program Manager
800 Independence Ave., S.W.
WASHINGTON DC 20591
　　　*{Hard Copy - Regular Mail}*

Director
Office of the Whistleblower Protection Program
U S Department of Labor, OSHA
Room N 3112 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
　　　*{Hard Copy - Regular Mail}*

Lisa M Werner, Esq.
Clark, Werner & Flynn, P.C.
192 College Street
BURLINGTON VT 05401
　　　*{Hard Copy - Regular Mail}*

John L Franco, Jr., Esq.
Attorney for Unified Turbines, Inc.
110 Main Street
BURLINGTON VT 05401
　　　*{Hard Copy - Regular Mail}*

**SERVICE SHEET** continued (2009AIR00024 Case Decision)     Page: 2

John Nagle
983 Holy Cross Road
Apartment 4
COLCHESTER VT 05446
          *{Hard Copy - Regular Mail}*

Unified Turbines, Inc.
28 Catamount Drive
MILTON VT 05468
          *{Hard Copy - Regular Mail}*

Mary E Hoye
U.S. Department of Labor
Occupational Safety and Health Administration
1441Main Street, Room 550
SPRINGFIELD MA 01103
          *{Hard Copy - Regular Mail}*

Administrative Review Board
U.S. Department of Labor
Suite S-5220
200 Constitution Ave., N.W.
WASHINGTON DC 20210
          *{Hard Copy - Regular Mail}*

**U.S. Department of Labor**       Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

JOHN NAGLE,                          ARB CASE NOS.    11-004

        COMPLAINANT,        ALJ CASE NO.     2009-AIR-024

   v.                               DATE:          **MAR 3 0 2012**

UNIFIED TURBINES, INC.,

      RESPONDENT.


**BEFORE:       THE ADMINISTRATIVE REVIEW BOARD**

**Appearances:**

***For the Complainant:***
    **Lisa M. Werner, Esq.,** *Clark, Werner & Flynn, P.C.***; Burlington, Vermont**

***For the Respondent:***
    **John L. Franco, Jr., Esq.,** *Law Offices of John L. Franco, Jr.***; Burlington, Vermont**

**Before: Paul M. Igasaki,** *Chief Administrative Appeals Judge;* **E. Cooper Brown,** *Deputy Chief Administrative Appeals Judge;* **Joanne Royce,** *Administrative Appeals Judge.*


## DECISION AND ORDER OF REMAND

    John Nagle filed a complaint alleging that his employer, Unified Turbines, Inc., retaliated against him in violation of the whistleblower protection provisions of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21), 49 U.S.C.A. § 42121 (West 2007) and its implementing regulations, 29 C.F.R. Part 1979 (2011). On September 27, 2010, a Department of Labor Administrative Law Judge (ALJ) concluded in a Decision and Order (D. & O.) that Nagle's claim should be dismissed because Unified Turbines did not subject him to any adverse action. For the following reasons, we reverse and remand.

2

## BACKGROUND[1]

Unified Turbines is a contractor of an air carrier under AIR 21 and repairs, overhauls, and modifies components for various airline manufacturers. It is privately owned by two partners, Richard Karnes and Karl Deavitt. Unified Turbines employed Nagle as a welder beginning in October 2007.

In August of 2008, Nagle began to notice a change in the quality of one of his co-worker's work (hereinafter referred to as "M")[2] and became aware that M was taking prescription pain medication. Nagle thought that M's work was deteriorating and that he seemed to be "high."

At some point during this time period, Nagle told Deavitt that the quality of M's work was poor, that he had seen M taking three or four pain pills at a time, and that M seemed high. Deavitt told him that he knew that M was taking prescription medication, but he was unaware that he was abusing it.

After this conversation, in September or October of 2008, Nagle saw M open the drawer of an absent co-worker. Nagle knew that this co-worker stored prescription pain pills in the tool drawer on his bench. Nagle later removed the bottle of pills, gave them to Karnes or Deavitt, and told them that he believed that M had an interest in the pills and that he did not want to be implicated if the pills went missing since he was working at the absent co-worker's bench.

On December 16, 2008, Nagle saw what he believed was M selling pills on the street outside of the work shop. He told Deavitt that he saw M selling pills and that M had problems. Deavitt told Nagle that he could not do anything unless he witnessed M doing something improper. On the same day, Nagle made a complaint to the Winooski, Vermont Police Department, that he saw M selling prescription drugs on the street.

M later confirmed that he was abusing prescription opiates during the fall of 2008 when Nagle made complaints to his superiors. M's job performance deteriorated during this time period.

On the morning of December 24, 2008, Nagle and M engaged in a minor shoving match that ended without any third-party intervention. It is not clear who began the altercation or who pushed whom first. Following the altercation, M told Deavitt about the incident and said that he could not work with Nagle anymore and that Deavitt had to do something about it. Shortly thereafter, Deavitt spoke to Nagle, informed him that he had "gone too far," instructed him to leave, and told Nagle to think things over during the upcoming holiday weekend. Deavitt did not say that Nagle was fired.

---

[1]     Unless otherwise indicated, the Background Statement is excerpted from the ALJ's findings of fact contained in the ALJ's Decision and Order (D. & O.) at pages 3-13.

[2]     The ALJ used the initial "M" in his Decision and Order to identify the co-worker, instead of the co-worker's name, because of the sensitive nature of the testimony concerning the individual's conduct. The Board uses the same initial designation for this individual.

Nagle believed he was fired, so he went back into the shop to retrieve his welding helmet and left. M was not sent home after the incident and continued to work for the remainder of the day. The workday on December 24, 2008, Christmas Eve, ended at noon.

On December 27, 2008, Nagle called his co-worker, Dan Hubbert, to discuss the incident. Nagle told Hubbert that he believed he was fired based of what was said even though Deavitt did not use the words "you're fired." Hubbert suggested that Nagle go into work the following Monday or at least call Deavitt or Karnes.

That same day, Nagle followed Hubbert's suggestion, telephoned Karl Deavitt's personal cell phone, and left a voicemail message on the cell phone during the Christmas holiday asking for a return call. Karl Deavitt did not return Nagle's call.

Unified Turbines paid Nagle for Christmas Eve, for Christmas Day, and for "Boxing Day" (Friday, December 26, 2008). Nagle did not return to work on Monday, December 29, 2008, or any time thereafter. Unified discontinued paying Nagle beginning on December 29, 2008. At some point during the week of December 29, 2008, Hubbert told Deavitt about his phone conversation with Nagle on December 27, 2008, and Nagle's belief that Deavitt had fired him.

Nagle filed an AIR 21 complaint with the Occupational Safety and Health Administration (OSHA) on February 13, 2009, challenging the termination of his employment. After OSHA denied the complaint, Nagle requested an ALJ hearing. After the hearing, the ALJ issued a D. & O. dismissing the complaint because he found that Nagle had voluntarily resigned and that Nagle's belief that he had been terminated and his decision to not report to work were objectively unreasonable – thus, the ALJ found that there was no adverse action.

Nagle timely appealed the ALJ's D. & O. to the Administrative Review Board (ARB or the Board).

## JURISDICTION AND STANDARD OF REVIEW

The Secretary of Labor has delegated her authority to this Board to issue final agency decisions in AIR 21 cases. Secretary's Order No. 1-2010 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 75 Fed. Reg. 3924 (Jan. 15, 2010); 29 C.F.R. § 1979.110(a).

AIR 21's implementing regulations provide, "[t]he Board will review the factual determinations of the administrative law judge under the substantial evidence standard." 29 C.F.R. § 1979.110(b). The Board reviews the ALJ's legal conclusions de novo. *Rooks v. Planet Airways, Inc.,* ARB No. 04-092, ALJ No. 2003-AIR-035, slip op. at 4 (ARB June 29, 2006) (citing *Mehan v. Delta Air Lines,* ARB No. 03-070, ALJ No. 2003-AIR-004, slip op. at 2 (ARB Feb. 24, 2005); *Negron v. Vieques Air Links, Inc.,* ARB No. 04-021, ALJ No. 2003-AIR-010, slip op. at 4 (ARB Dec. 30, 2004)).

4

## DISCUSSION

### 1. *AIR 21 Whistleblower Provision*

AIR 21's whistleblower protection provision, 49 U.S.C.A. § 42121, provides at subsection (a):

> No air carrier or contractor or subcontractor of an air carrier may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee . . . provided . . . to the employer or Federal Government information relating to any violation or alleged violation of any order, regulation, or standard of the Federal Aviation Administration or any other provision of Federal law relating to air carrier safety under this subtitle or any other law of the United States.

To prevail under AIR 21, a complainant must prove by a preponderance of the evidence that his protected activity was a contributing factor to the alleged adverse action. *See* 49 U.S.C.A. § 42121(b)(2)(B)(i); 29 C.F.R. § 1979.109(a).[3] If the complainant proves that the respondent violated AIR 21, the complainant is entitled to relief unless the respondent demonstrates by clear and convincing evidence that it would have taken the same unfavorable action in the absence of the protected activity. *See* 49 U.S.C.A. § 42121(b)(2)(B)(ii); 29 C.F.R. § 1979.109(a).

### 2. *ALJ Findings of Fact and Conclusions of Law*

The sole issue raised on appeal is whether Unified Turbines engaged in adverse action against Nagle. Nevertheless, with respect to other elements of the claim, we note that substantial evidence fully supports the ALJ's finding that Nagle engaged in protected activity when he complained about M's drug abuse on the job. FAA regulations contain extensive drug testing provisions and prohibitions pertaining to illegal drug use by aviation industry workers who perform "safety-sensitive" functions, as did both Nagle and M. The record before us demonstrates that while Nagle had no detailed knowledge of FAA regulations, he was an experienced welder, familiar with Unified Turbines substance abuse policy, who was concerned that M's drug use could result in injury to co-workers and potentially compromise aircraft parts. Nagle reasonably believed that M's ongoing abuse of prescription drugs was in violation of FAA safety regulations. D. & O. at 14-15. The ALJ further correctly concluded Nagle proved employer knowledge of protected activity because it was undisputed that Unified Turbines knew about Nagle's reports of M's drug abuse. *Id.*

---

[3]     A complainant's failure to prove by a preponderance of the evidence any one of the above listed elements of his complaint warrants dismissal. *Robinson v. Northwest Airlines, Inc.,* ARB No. 04-041, ALJ No. 2003-AIR-022, slip op. at 7 (ARB Nov. 30, 2005).

Turning to the question of whether Unified Turbines engaged in adverse action against Nagle, the ALJ found that Nagle's professed assumption that Unified Turbines had terminated his employment and his decision not to report to work the following Monday were objectively unreasonable. *Id.* at 17. Thus, the ALJ concluded that Nagle voluntarily resigned and was therefore not subject to adverse action. *Id.* To make this determination, the ALJ turned to Vermont law holding that "shaping up or shipping out" does not equal an involuntary or coerced termination. *Id.* However, ARB precedent arising under the Surface Transportation Assistance Act (STAA), not Vermont law, controls a determination of whether there was adverse action in this case. The statutory scheme established by AIR 21 essentially mirrors the protective provisions of the STAA (as well as other whistleblower statutes) and jurisprudence developed under that statute should be applied to this case. *See Sylvester v. Paraxel Int'l LLC*, ARB No. 07-123, ALJ Nos. 2007-SOX-039, 2007-SOX-042, slip op. at 35 (ARB May 25, 2011) (the Board interprets whistleblower statutes in a parallel manner).

Accordingly, we remand for consideration of whether Nagle was discharged under ARB precedent in *Minne v. Star Air, Inc.*, ARB No. 05-005, ALJ No. 2004-STA-026 (ARB Oct. 31, 2007) and *Klosterman v. E.J. Davies, Inc.*, ARB No. 08-035, ALJ No. 2007-STA-019 (ARB Sept. 30, 2010). In these cases, "discharge" has been interpreted to include the situation where the employment relationship "was ended by one-sided or perhaps mutual assumption by the parties – i.e., by means of behavior from which the parties deduced that the employment relationship was at an end."[4] In the absence of an actual resignation by the employee, "an employer who decides to interpret an employee's actions as a quit or resignation has in fact decided to discharge that employee." *Minne*, ARB No. 05-005, slip op. at 14 (footnotes omitted). The determination on remand may require additional findings of fact as it is unclear from the D. & O. what importance the ALJ gave to the evidence that Nagle called Deavitt to discuss his continued employment, that Deavitt did not call him back, and that, during the OSHA investigation, Deavitt denied that Nagle called him. The ALJ also did not analyze the importance of the evidence that Hubbert told Deavitt that Nagle believed he was fired and that Deavitt took no action when he learned that Nagle believed he was fired. D. & O. at 13.

## CONCLUSION

The ALJ's determination of no adverse action failed to take into consideration relevant ARB case authority. Therefore, we **VACATE** that part of the ALJ's Decision and Order and

---

[4]     *Minne*, ARB No. 05-005, slip op. at 13.

6

**REMAND** for further consideration of whether Unified Turbines took adverse action against Nagle and for such further proceedings as may be warranted consistent with this decision.

     **SO ORDERED.**

**JOANNE ROYCE**
**Administrative Appeals Judge**

**PAUL M. IGASAKI**
**Chief Administrative Appeals Judge**

**E. COOPER BROWN**
**Deputy Chief Administrative Appeals Judge**

**U.S. Department of Labor**    Office of Administrative Law Judges
O'Neill Federal Building - Room 411
10 Causeway Street
Boston, MA 02222

(617) 223-9355
(617) 223-4254 (FAX)



**Issue Date: 27 September 2010**

CASE NO.:    **2009-AIR-00024**

In the Matter of

**JOHN NAGLE,**
        Complainant,

        v.

**UNIFIED TURBINES, INC.,**
        Respondent.

*Appearances*:
Lisa Werner (Clark, Werner & Flynn, P.C.)
Burlington, VT, for the Complainant

John Franco, Jr., Burlington, VT,
for the Respondent

*Before*: Daniel F. Sutton, Administrative Law Judge

### DECISION AND ORDER DISMISSING COMPLAINT

### I. Statement of the Case

This matter arises under Section 519 of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (the "Act" or "AIRA"), 49 U.S.C. § 42121,  and the implementing regulations at 29 C.F.R. Part 1979.  The Complainant, John Nagle, alleges that the Respondent, Unified Turbines, Inc., fired him from his position as a welder on December 24, 2008, in retaliation for his engaging in activities protected under the AIRA and the Occupational Safety and Health Act of 1970 (the "OSH Act"), 29 U.S.C. § 651 *et seq.*  Following an investigation, the U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA"), acting for the Secretary of Labor, notified Nagle by a letter dated July 28, 2009, of the Secretary's finding that there was no reasonable cause to believe that Unified Turbines had violated either the AIRA or the OSH Act.  49 U.S.C. § 42121 or 29 U.S.C. § 660(c).  Nagle filed a timely objection to the Secretary's AIRA determination pursuant to 29 C.F.R. § 1979.106, and he requested a formal hearing before an administrative law judge ("ALJ") pursuant to 29 C.F.R. § 1979.107.[1]

---

[1] Nagle's claims under the OSH Act are not a part of this proceeding.  Jurisdiction over retaliation claims under section 11(c) of the OSH Act lies in the district courts.  29 U.S.C. § 660(c).

The hearing was initially scheduled to convene on October 14, 2009. However, the parties filed a Joint Motion for Extension of Time on October 8, 2009. The motion was granted, and the hearing was conducted over two days, February 17 and 18, 2010, in Burlington, Vermont. Both parties appeared and were represented by counsel. Testimony was heard from John Nagle, [M],[2] Robert Martin, William Kinsell, Daniel Hubbert, Richard Benoit, Karl Deavitt, and Richard Karnes. Stipulations were admitted as ALJ Exhibit ("ALJX") 16A, and documentary evidence was admitted as Joint Exhibits ("JX") 1-5, 7-11, 13, 14, and 16. Hearing Transcript ("HT") at 390. The Respondent's objection to JX 15 was taken under advisement, and the parties were directed to address admissibility in their briefs. *Id.* at 380. The Respondent did not address the admissibility of JX 15 in its post-hearing brief. Accordingly, the objection is deemed waived, and JX 15 has been admitted.

After careful consideration of the record and the parties' respective positions, the ALJ concludes that Nagle has failed to prove that Unified Turbines terminated his employment in violation of AIRA. Accordingly, he is not entitled to relief.

## II. Findings of Fact

A. Stipulations

The parties introduced the following stipulations at the hearing:

1. Unified Turbines, Inc., is currently located in Milton, Vermont. However at all times pertinent to this matter it was located in Winooski, Vermont;

2. Unified is privately owned by two partners, Richard Karnes and Karl Deavitt;

3. Unified repairs, overhauls, and modifies components for various airline manufacturers;

4. Unified is a Federal Aviation Administration ("FAA")-approved repair station under 14 C.F.R. Part 145;

5. Unified is a contractor of an air carrier within the meaning of 49 U.S.C. § 42121;

6. Nagle has been employed by Unified as a welder since October 2007;

7. Nagle is a good welder;

8. On December 16, 2008, Nagle made a complaint to the Winooski, Vermont Police Department;

9. Sometime prior to the complaint to the Winooski Police Department, Nagle had made the same allegations to Karl Deavitt;

---

[2]Initials have been used in this decision instead of the names of certain individuals who are not parties in light of the sensitive nature of some of the testimony.

10. During the morning of Christmas Eve, Wednesday, December 24, 2008, Nagle was involved in a minor shoving match with a co-worker [M] that ended without any third party intervention, and was not witnessed by either Rick Karnes or Karl Deavitt;

11. Karl Deavitt learned about the incident from [M];

12. [M] was not sent home for the incident and continued to work for the balance of the work day;

13. The Christmas Eve, 2008 work day at Unified ended at noon;

14. Nagle left a voicemail message on Karl Deavitt's personal cell phone during the Christmas holiday asking for a return call;

15. Karl Deavitt did not return Mr. Nagle's call;

16. Nagle was paid by Unified for all of Christmas Eve, for Thursday Christmas Day, and for Boxing Day, Friday, December 26, 2008;

17. Nagle did not return to work at Unified on December 29, 2008, or any time thereafter; and

18. Unified discontinued paying Mr. Nagle commencing December 29, 2008.

ALJX 16A; HT at 390.

B. Background

Unified Turbines is approved by the FAA as an overhaul and repair facility for aircraft engine components. ALJX-16A, HT at 226. The company was established in 1997 by Rick Karnes. In 2000, Karnes entered into a partnership with Karl Deavitt, and the partners have jointly run the company since that time. HT at 226.

Nagle is a forty-four year old who graduated from high school in 1984. HT at 27. He has been working as a welder in various locations since 1986. *Id.* He has full custody of his minor daughter. *Id.* at 79. Nagle does not receive child support payments from his daughter's mother, although have been court-ordered. *Id.* at 79. His daughter has been diagnosed with Post Traumatic Stress Disorder ("PTSD") for which she receives counseling. *Id.* at 81. Nagle first worked as a welder for Turbine Weld in Winooski, Vermont before relocating with the company to Venice, Florida in 1993. *Id.* at 28. Around 1994, Nagle left Turbine Weld and later started working for Crane Aerospace, a company that that the former owner of Turbine Weld started. *Id.*

C. Complainant's Employment with Unified Turbines

In 2007, when he was working in Florida as a welding shop manager, Nagle learned from Dan Hubbert, a friend who worked at Unified Turbines, that Unified Turbines was looking for a new welder. *Id.* at 30-31. He then had several telephone conversations with Rick Karnes and Deavitt which lead to an offer of employment and relocation expenses which Nagle accepted in October of 2007. *Id.* at 31-34. Nagle testified that although it was his understanding that he

- 3 -

would be paid $20.00 per hour, he discovered when he received his first paycheck at Unified Turbines that he was being paid $17.50 per hour. *Id.* at 35-36. He discussed his hourly rate with Karnes and Deavitt who indicated that he would receive an increase after a review. *Id.* at 36; 275-76. However, Nagle's pay was not increased because, as Karnes explained, Nagle was chronically tardy and missed a significant amount of time from work. *Id.* at 275-77. Nagle confirmed that he missed a lot of time from work which he attributed to difficulties related to his daughter's transition into the local school system. *Id.* at 110-14. Deavitt testified that Unified Turbines was aware of Nagle's difficulties as a single parent and took no action against him for attendance issues. *Id.* at 181-82. Deavitt explained, "I understand his single dad situation, and we did – we definitely took that into consideration." *Id.* at 181.

Nagle's dissatisfaction with his pay continued over the course of his employment at Unified Turbines. Coworkers testified that Nagle repeatedly told them that he was thinking of quitting and finding another job because he was not making enough money at Unified Turbines. HT at 255; 327. Nagle agreed that he frequently complained to coworkers about his pay, and that he may have told them that he wanted to quit. *Id.* at 106-07, 109.

At Unified Turbines, Nagle performed "purge welding" on aircraft engine turbines. HT at 34-35. He explained that "purge welding" utilizes argon gas to minimize burning and produce a particularly strong weld. *Id.* at 35. As a welder, Nagle worked with bench mechanics who did preparation work on the metal aircraft engine components. *Id.* at 34, 37-38. M was one of the bench mechanics with whom Nagel regularly worked at Unified Turbines. *Id.* at 37-39. Nagle testified that M was relatively new when he came to Unified Turbines, but he thought M was a "pretty good" bench mechanic with a lot of potential. *Id.* at 38.

D. Nagle's Concerns and Complaints about M

Nagle testified that he noticed a change in the quality of M's work beginning in August 2008. HT at 40. At that time, Nagle was aware that M had prescriptions for pain medication. *Id.* at 42-43. According to Nagle, M "seemed lazy at times and then just irritable, up and down," and the quality of his work deteriorated to the point that Nagle had to return parts for further preparation. *Id.* Nagle further testified that he observed physical changes in M during this time frame in that he appeared to be "high" and his eyes were "[j]ust not normal. Sometimes they'd be like small and sometimes wide." *Id.* at 41. Nagle also observed M to have slurred or "sloppy" speech at times, and that the pace of M's work "absolutely slowed down." *Id.* at 42. He stated that he had observed M taking as many as three pills at the same time. *Id.* In Nagle's view, M's apparent abuse of prescription pain medication created a potential "safety issue" in that he was concerned that M could injure himself or a coworker on the job. *Id.* at 43-44. In addition, he said that the deterioration in the quality of M's work potentially compromised the aircraft engine components, explaining that, "[t]his isn't flipping pizzas or stocking cans on the shelves." *Id.* at 44.

M confirmed that he developed an opiate addiction problem during 2008. HT at 133-35. He testified that the problem worsened during the summer and into the fall of 2008, and he agreed that the addiction affected his productivity at work and probably the quality of his work as well. *Id.* at 135-36, 158, 167. However, he denied that his speech was slurred, and he did not notice anything unusual about his eyes. *Id.* at 142. M explained that he was first prescribed

- 4 -

narcotic pain medication, primarily Vicodin, after he suffered multiple injuries in an automobile accident about five years ago. *Id.* at 134, 153-54. He received additional prescriptions after he was involved in an accident in October of 2008 when a portion of his thumb was severed while he was assisting his girlfriend's father split wood with a motorized log splitter. *Id.* at 153-56. M stated that the prescriptions were written by two different doctors, thus providing him with overlapping prescriptions which led to his taking more than was prescribed and developing a dependency. *Id.* at 156-58. He testified that his abuse of narcotics affected his appetite and his thinking and that he became argumentative with his girlfriend. *Id.* at 158. He also acknowledged that the worsening of his opiate addiction during the fall of 2008 coincided with the deterioration of his relationship with Nagle at work. *Id.* at 141-42. By February of 2009, he'd had enough, and he went to Deavitt and Karnes to discuss the problem. *Id.* at 146-49, 163-64. As a result of this discussion, United Turbines loaned M $1,000.00 so that he could enter a rehabilitation program in March of 2009. *Id.* at 147-48.

Nagle testified that following the accident with the log splitter, M came to work with his thumb "wrapped up in a big old bandage" and told "everybody in the shop" that he'd been involved in an accident with a log splitter. HT at 89. Nagle thought that M's description of the accident was "curious . . . a weird story" because "[a] wood splitter is kind of slow . . . ." *Id.* at 90. This incident served to heighten Nagle's concerns about M's ability to do his job safely. *Id.* In Nagle's opinion, a person could hurt himself more easily on one of the pneumatic or hydraulic cutting and grinding tools used at Unified Turbines than he could on a wood splitter. *Id.* Nagle was familiar with safety issues in the workplace because he had received OSHA training in the past and had worked as a manager. *Id.* at 45-46. He was also familiar with Unified Turbines' substance abuse policy which states that "[a]ny involvement with alcohol and drugs which adversely affect the work place will not be tolerated." *Id.* at 46; JX 9 at 1.

### 1. Nagle's First Complaint Regarding M

Nagle testified that during the time that he was observing escalating problems with M's work that he attributed to abuse of prescription pain medication, he had a conversation with Deavitt that was precipitated by a disagreement with M over the responsibility for some defective work. HT at 47. Nagle said that he told Deavitt that the quality of M's work was poor, that he had witnessed M taking "three or four pain killers at a time," and that M "seemed high and he was popping the pills." *Id.* at 47-48. According to Nagle, Deavitt responded that there was nothing he could do because the pills were prescribed. *Id.* at 48. Nagle stated that he countered that the "script doesn't say take three or four at a time." *Id.* Deavitt essentially corroborated Nagle's account of this conversation though he recalled that his response was, "John, I'm aware that Eric is on prescription drugs. I'm not aware of him abusing those drugs." *Id.* at 183.

### 2. Nagle's Second Complaint Regarding M

After his conversation with Deavitt about M, Nagle observed another incident involving M which he perceived as indicative of prescription drug abuse. HT at 49. Nagle testified that the incident occurred in late September or October of 2008 while K, another bench mechanic, was out of work recovering from surgery for carpal tunnel syndrome. *Id.* Nagle explained that he was filling in during K's absence and that he frequently traveled back and forth between K's

bench and his welding booth. *Id.* Nagle knew that K kept a bottle of pills in a tool drawer on his bench, and his suspicions were aroused after he noticed that this drawer had been repeatedly opened and when he saw M open this drawer. *Id.* at 50-51. Although he did not see M remove any of the pills, Nagle decided that it would be best to remove the pills and deliver them to management. *Id.* at 51. Nagle took the bottle of pills and brought them to the front of the shop where he gave them to Karnes or Deavitt, stating that he believed that M had an "interest" in the pills and that he did not want to be implicated in any misappropriation of the pills since he was working at K's bench. *Id.* at 51, 56-57.

Deavitt testified that Nagle brought a bottle of pills into the office, indicating that they belonged to K and that he did not believe that they should be left in the shop while K was out. HT at 187-88, 238-39. However, he stated that he did not recall Nagle mentioning M in connection with the pills or saying that he was concerned about being accused because the pills were removed from K's bench. *Id.* at 188. M denied ever going through K's drawer or taking any pills from the drawer. *Id.* at 162.

### 3. Nagle's Third Complaint Regarding M

Nagle testified that he witnessed what he believed to be a drug transaction on December 16, 2008, between M and a young man on a sidewalk outside of the Unified Turbines shop. HT at 58-61. Specifically, Nagle testified that he was sitting in his truck in the parking lot outside of the shop during the lunch break when he saw M stop on his way back into the shop to answer a mobile telephone call or text message. *Id.* at 58. According to Nagle, he next observed the following:

> And then he [M] proceeded back down the steps and walked across the whole building to the sidewalk. And this boy came walking across the other side and met with him. And he gave him money and [M] took this pill vial out and gave him pills, and that was the end of it.

*Id.* at 58-59, 61-62. Nagle testified that he then went into the shop where he recounted the incident to Deavitt, stating, "I've seen him selling his pills now. He's got problems." *Id.* at 59-60. Nagle stated that Deavitt responded that he would have to see an incident before he could do anything about it. *Id.* at 60. Nagle stated that he then told Deavitt, "Well I will." While he initially seemed confused about the timing, Deavitt confirmed that Nagle reported seeing M engaging in what appeared to be a drug transaction outside of the shop. *Id.* at 189-93.

### 4. Nagle's Report to the Winooski Police

Following his conversation with Deavitt. Nagle went to the Winooski, Vermont police on December 16, 2008 at approximately 5:00 p.m. HT at 60. He testified that he reported to the police that he had seen M "selling his prescription drugs on the sidewalk to another guy, that I witnessed him being high on it a work, I witnessed him taking more, and other – just that." *Id.* at 62. *See also* JX 5. Records from the Winooski Police Department contain the following narrative account from Officer James Learned of what Nagle reported:

On 12-16-08 at approximately 1700 hours John Nagle (DOB:2-16-66) came into the Winooski Police Department to report some suspicious activity that has been occurring at his place of employment at Unified Turbines in Winooski.

Nagle told me that he has high suspicion that a fellow employee is dealing pills, drugs and possible stolen items while he is at work.

Nagle said the persons name is "[M]" and he drives a white chevy blazer that is usually parked out behind the shop. Nagle said "[M]" is in his mid 20's. John told me that "[M]" receives a lot of text messages and makes short trips out side where he meets people in "nice looking vehicles".

Nagle said he believes "[M]" has his own prescriptions for Oxy's and usually has a lot with him at all times.

Nagle said "[M]" usually leaves at noon for lunch and returns at 12:30 or later. He said they work from 7:30-1600.

Nagle said he would be willing to look into this further.

I advised Nagle I would forward the information listed above to our Detective.

JX 14.[3] Richard W. Benoit, the Deputy Chief of Police in Winooski, testified at the hearing that he determined that there was not reasonable cause for further investigation of Nagle's report as it provided no information that any crime had taken place. HT at 353-55, 360-61, 364-65. In particular, Deputy Chief Benoit testified that there was nothing in the Department's records that Nagle had claimed that he had actually witnessed M involved in a drug transaction. *Id.* at 356-57. Deputy Chief Benoit also testified that the Winooski Police Department never informed Unified Turbines that Nagle had filed a complaint, and that the Department did not have any contact with Unified Turbines about Nagle's allegations until sometime after January 9, 2009 when Officer Learned wrote a "To whom it may concern" letter (JX 5) at Nagle's request, confirming Nagle's December 16, 2008 visit to the Winooski Police. *Id.* at 362-63.

E. Unified Turbines' Response to Nagle's Allegations

---

[3]It is noted that the narrative of Nagle's report from the Winooski Police records varies in several material respects from Nagle's testimony at the hearing. First, there is no mention in the narrative of any incident on December 16, 2008 or any mention of Nagle reporting that he had witnessed M exchange pills for money on a sidewalk outside of Unified Turbines earlier that same day, although Nagle claimed on rebuttal that he had reported this to the police. HT at 378. Second, the narrative states that Nagle reported that he was suspicious that M was possibly dealing in stolen items, a suspicion that was never addressed in Nagle's testimony. Third, the narrative states that Nagle reported that M received a lot of text messages at work and made multiple short trips outside to meet with people in "nice cars" which are additional observations not described in Nagle's hearing testimony. Finally, the narrative refers to "Oxys" which were not mentioned at the hearing. These discrepancies are not insignificant details that a witness could be expected to overlook. Nagle had ample opportunity at the hearing during friendly direct examination to recount the basis for his suspicions about M. In the ALJ's view, the discrepancies between his report to the police and his testimony at the hearing are too numerous and too significant to warrant any conclusion other than his testimony regarding M's behavior is not completely reliable.

Deavitt testified that after Nagle raised concerns about M's drug use, he began to monitor M more closely but did not observe any behavior or problem that he felt warranted action. HT at 184-87, 196-97. Deavitt further testified that with the several checkpoints used in the shop, there is no way that an unsafe piece of equipment would leave the shop and go to a customer. *Id.* at 197. He explained that no piece of equipment leaves the Unified Turbines shop without meeting the standards of an overhaul manual and all of the applicable standards established by the FAA. *Id.* at 198. Unified Turbines' inspector, Robert Martin, testified that the quality of M's work declined during 2008 so that he had to send more parts back to him for additional work. *Id.* at 264-66. Deavitt admitted that M could have potentially been hurt or hurt a co-worker if he had been high at work. *Id.* at 198. However, he went on to state that had he noticed any signs that M was high at work he would have intervened. *Id.* Later, when M told Deavitt and Karnes that he had an addiction to opiates, the partners told him that he would not be able to work in the shop while suffering from such an addiction until he successfully completed a rehabilitation program. *Id.* at 199.

Karnes and/or Deavitt also spoke to M after Nagle reported that he had seen M selling pills outside of the shop. M testified that he was confronted by Karnes or Deavitt about Nagle's allegations about pill selling and said that he responded that he had simply been handing keys to his girlfriend or his girlfriend's mother. HT at 147-48. While he was unable to recall the date of this confrontation, he testified that he believed that it was sometime in January or February of 2009 after Nagle had left Unified Turbines. *Id.* at 160. Deavitt expressed confusion about the dates, but eventually agreed that it "[d]oes make sense" that Nagle spoke to him on December 16, 2008, the same day that Nagle went to the Winooski Police. *Id.* at 191. Deavitt also agreed that the nature of Nagle's allegation was such that it would have been addressed promptly, either that day or the next. *Id.* at 191, 224. Deavitt further testified that he and Karnes did speak to M about Nagle's allegation, and he believed that M would have been aware of the fact that Nagle had accused him of selling pills before December 24, 2008. *Id.* at 223-24. Karnes also testified that Deavitt informed him that Nagle had reported seeing M selling pills outside of the shop and that he and Deavitt confronted M about Nagle's allegation, most likely that same day or the next day. *Id.* at 289-90. However, Karnes stated that he did not learn that Nagle had gone to the Winooski Police until after Nagle left Unified Turbines. *Id.* at 279.[4]

Unified Turbines maintains a drug testing protocol for all of their safety sensitive employees. HT at 241. M and Nagle were both considered "safety-sensitive" employees subject to random drug tests. *Id.* at 242, 245. Deavitt testified that there has never been a positive test result from random drug testing at Unified Turbines. *Id.*

F. The December 24, 2008 Altercation

---

[4]Unified Turbines apparently learned of Nagle's December 16, 2008 report to the Winooski police sometime after January 8, 2009 when Karnes received a facsimile of the January 9, 2009 "To whom it may concern" letter (JX 5) penned by Officer Learned. HT at 279-80; 362-63; JX 8.

During the morning on December 24, 2008, Nagle and M were involved in a verbal and physical altercation in the Unified Turbines shop between 9:00 and 9:30 a.m. HT at 65. Nagle testified that he had walked to the inspection area, which is separated from the shop by a double door, to fill a cup of water when M "started just verbally assaulting me, calling me all kinds of names." *Id.* at 63. Nagle stated that he tried to walk away, but M followed him back into the shop, kicking the door open and "verbally running his mouth to me." *Id.* At that point, Nagle stated that he turned around and told M, "Don't [expletive] talk to me that way!" *Id.* at 62-64. According to Nagle, the following then occurred:

> And he came right at me. I was dead still, stopped. And he came and pushed me with two hands. He came back at me again. I pushed him away with my left hand, and then it broke up, and I went back to the weld booth for a brief time.

*Id.* at 64. M denied pushing Nagle. Instead, he testified that he had an argument with Nagle who then pushed him. *Id.* at 142-43. M said that he could not recall what he and Nagle were arguing about. *Id.* at 166.[5] However, he insisted that he did not push Nagle, that he would not push Nagle because he is a bigger man, and that M is a gentle person by nature. *Id.* at 144-45.

Dan Hubbert, a current Unified Turbines employee and friend of Nagle's who was called as a witness by Unified Turbines, testified that the altercation took place approximately five feet in front of where he was working on the morning of December 24, 2008. HT at 323. He provided the following account:

> I recall John coming out of the inspection room and [M] following him. Something was said. I'm not sure what [M] said to him. I didn't catch that part. Then they came over to where my bench was, and John got over in his face and said, "Don't talk to me that way." [M] shoved him with two hands. I mean not hard, but he pushed him back. And then John pushed him, pushed [M] back with one hand, his left hand as I remember. And then it kind of broke up, and I think John went down to the welding booth. And I'm not sure if [M] went up front to tell them what happened or where he went.

*Id.* at 323-24; *see also* JX 3. William Kinsell, a former employee who was also called by Unified Turbines, provided a somewhat different account. Kinsell testified:

> I was working at my bench, and I noticed out of the corner of my eye and heard some noise, you know, some arguing. And I happened to turn my head and look over, and they were in each other's face, you know, kind of yelling back and forth. And I had to take off my headset, and then I saw John push [M]. And then I thought they were playing around at first, but then I noticed the expressions on the face, and it wasn't playing around.

---

[5] On rebuttal, Nagle also testified that he had "no idea" as to what he and M may have been arguing about when the altercation occurred on December 24, 2008. HT at 375. It is noted that Nagle's post-hearing brief states that he testified on rebuttal that "[d]uring [M]'s angry words, before the pushing, [M] told John he hated him. Transcript at 374-375." Complainant Brief at 15, ¶ 68. The ALJ has carefully reviewed the transcript and finds that Nagle, contrary to the representation in his brief, did not testify that M said that he hated Nagle on December 24, 2008.

- 9 -

*Id.* at 306. Kinsell further testified that after Nagle pushed him, M put both of his arms up at shoulder height as he was stepping backward, but he did not actually touch Nagle. *Id.* at 307, 311. Kinsell continued that M is smaller than Nagle and "just a scared individual . . . kind of timid," and he described M's actions as "more of a defensive" reaction to Nagle. *Id.* Kinsell testified that the incident took place approximately four feet from where he was working, and he was sure that Nagle pushed M first, though he did acknowledge that he was working when he first heard the argument and had to look up and turn to observe what was transpiring between Nagle and M. *Id.* at 306, 310-15. He said that the incident was "pretty much over" by the time he removed his headset. *Id.* at 307. Kinsell stated that Nagle then went back to his work area and that M came over to Kinsell's work area and said "they were having an argument about some words that were going back and forth." *Id.* Kinsell testified that M then "went into the front, over by the inspection area." *Id.*

### G. The Aftermath

Following the altercation with Nagle, M told Deavitt about the incident and said that he could not work with Nagle anymore, and that Deavitt had to do something about it. HT at 146; 222. At this point, Nagle had gone out to his truck for his customary fifteen-minute break at 10:00 a.m. to smoke a cigarette. *Id.* at 66. While he was sitting in the truck, Deavitt came outside and told Nagle something along the following lines: "I've already punched you out. Put your [expletive] truck in drive and drive your [expletive] out of here. You've gone too far." *Id.* at 66-67; 207-08. Deavitt testified that he also told Nagle to take the long weekend to think about whether he still wanted to work at Unified Turbines and to come in on the following Monday talk about it. *Id.* at 208-09, 229.[6]

Nagle testified that he believed that he had been fired, so he briefly went back into the shop to retrieve his welding helmet and then left at approximately 10:10 a.m. *Id.* at 67-69. He denied having any interaction with anyone during his brief trip back into the shop to retrieve his welding helmet. *Id.* at 68. Deavitt, however, testified that he did not fire Nagle and only wanted to get him out of the shop because he had concluded that Nagle was the instigator, and he wanted to diffuse the situation. *Id.* at 210, 222. Deavitt also recounted that Nagle had been in a bad, "pissed off at the world mood" earlier that morning which played a part in his decision to send Nagle home after the confrontation with M. *Id.* at 231-32. Specifically, Deavitt testified that when he greeted Nagle with a "Good Morning" that day, Nagle responded "What's so [expletive] good about it." *Id.* at 231. Deavitt further stated that he had observed Nagle make similar comments to other employees that day. *Id.* at 232.[7] Deavitt testified that after he left Nagle and returned to the shop, he heard the back door open behind him, and he saw Nagle come back into the building. *Id.* at 210. He further testified, "That's when I said, 'John, I thought I

---

[6]December 24, 2008, was a Wednesday, and December 25th and 26th, Christmas Day and Boxing Day, were paid holidays for Unified Turbines employees. HT at 271-72.

[7]Nagle, who testified on rebuttal after Deavitt, did not specifically contradict Deavitt's account of his statements on December 24th, but he did deny being "disgruntled" or otherwise in a bad mood. HT at 376.

just told you to get in your truck and get the [expletive] out of here,' probably is what I said, 'And come back on Monday and we'll talk about this.'" *Id.* at 210, 230.[8]

Two witnesses testified regarding Deavitt's statements upon his return to the shop after telling Nagle to leave on December 24, 2008. Robert Martin, the inspector at Unified Turbines, stated that he was in the shop on December 24, 2008 when he observed Nagle walk over to the welding booth and put something, possibly a lunch pail or welding helmet, under his arm. HT at 256. Martin further testified that he heard Deavitt tell Nagle, "I told you to go home and take the weekend, think about if you want your job, and let me know on Monday." *Id.* Martin stated that "[i]t may not be that exact words, but that's what he said." *Id.* Kinsell also testified that he was on the shop floor when Deavitt returned to the shop following his confrontation with Nagle in the parking lot. *Id.* at 307-08. However, he did not recall Deavitt saying anything to Nagle inside the shop:

> Q.  Did you recall later after the shoving match there to be an exchange, words exchanged between Karl Deavitt and Mr. Nagle out on the shop floor?
>
> A.  That was outside. We were kind of standing back off from the dock and kind of peeking out. And I couldn't hear what was being said. And then when Karl came back in, we'd asked what happened, and he made it clear first that there is no touching any other individuals in the shop, no hitting. And then he said that he told John that he had four days, because we had a four-day vacation, to think about if he wanted to still work at Unified Turbines and, if not, he could leave.

*Id.* Kinsell's account is consistent with Nagle's testimony that there was no interaction with anyone when he briefly reentered the shop to retrieve his welding helmet, while Martin's testimony corroborates Deavitt's version that he again told Nagle inside the shop to leave and let him know on Monday whether he still wanted his job at Unified Turbines. Given the small size of the shop, it is unlikely likely that both accounts are accurate. Noting the particular detail associated with Kinsell's recollection (*i.e.*, that he had been "peeking" out to the parking lot to see what was occurring between Nagle and Deavitt and that he then asked Deavitt upon his return to the shop what had happened), the ALJ credits his testimony and finds that Deavitt did not say anything further to Nagle when the latter returned to the shop to get his helmet.

On December 27, 2008, Nagle called Dan Hubbert to discuss the events of December 24th. HT at 69, 324. According to Hubbert,

> He [Nagle] had said Karl had said that -- basically to put his F-ing truck in gear. He had gone over the line and think about -- take the long weekend to think about what he had done, you know, as far as [M], their shoving match and what not, to which I said, "Did he actually tell you?" He thought he was fired, said, "Far as I'm concerned, I'm fired." And I said, "Did Karl actually tell you that you were fired?" and he said, "No, not really."

---

[8]Deavitt admitted that he did not mention this statement during a telephone hearing in March of 2009 on Nagle's claim for unemployment benefits. HT at 212-14, 216.

*Id.* at 325; *see also* JX 3. Hubbert suggested that Nagle go into work on the following Monday or at least call Deavitt or Karnes to try and smooth things out. *Id.* at 325, 336-37, 348. Hubbert stated that Nagle responded, "I'm not going in Monday." *Id.* at 337. He further testified that he told Nagle, "That's probably not a good idea." *Id.*

As suggested by Hubbert, Nagle did place a call to Deavitt's personal mobile phone on December 27th and left a message. HT at 70; 205-06; JX 11. Nagle testified that his message was, "Karl, this is John. I need to talk to you about my job." *Id.* at 70. Deavitt testified that the message simply said, "Karl, this is John. Call me." *Id.* at 205.[9] It is undisputed that Deavitt did not return Nagle's call and that Nagle did not report to work on the Monday after the Christmas holiday. *Id.* at 70-71, 104-05; 205.

Nagle testified that when Deavitt did not return his call, "I took it as I must be fired, then, that the way I felt on that day must be true." HT at 70. Nagle stated that although Deavitt never told him that he was "fired," he concluded from what Deavitt had said on the 24th and the absence of a response to his call on the 27th that he had been fired. *Id.* at 105-06. Nagle agreed that he had frequently complained to coworkers about his pay at Unified Turbines and that he may have told coworkers that he intended to quit. *Id.* at 106-07. However, he denied that he retrieved his personal welding helmet from the shop on December 24th because he intended to quit. *Id.* at 108-09. Nagle further testified that he lost his health insurance after his employment at Unified Turbines ended and that he and his daughter had to endure nine months of financial and emotional stress until September of 2009 when he finally secured another job in which he earns $13.00 per hour. *Id.* at 74-83. He asserted that because of his daughter's health care needs, he has never quit a job without first securing other employment. *Id.* at 83.

Deavitt testified that Nagle quit his job at Unified Turbines and was not fired. HT at 200. He stated that he assumed that Nagle wanted to "discuss what happened" when he left the December 27th message on his mobile phone, but he did not return the call because he had instructed Nagle to come in on the following Monday and he did not wish to discuss an employment matter over a holiday weekend on his personal time and phone. *Id.* at 205-07, 220-21.

Nagle was paid for a full eight-hour workday on December 24, 2008, and he received eight hours holiday pay on December 25 and 26, 2008. JX 2, HT at 210; 271-72. Karnes testified that Unified Turbines would not have paid Nagle for December 25 and 26 if he had been fired on December 24, 2008. HT at 273. Karnes stated that if Nagle had showed up at Unified Turbines on Monday, December 29, 2008, he would have still had his job. *Id.* at 278. He also testified that he and Deavitt had never discussed terminating Nagle's employment and that

---

[9]No recording of the message was introduced. JX 11, which is a photocopy of page from Nagle's mobile phone records, contains a handwritten notation that Nagle placed next to the line showing the December 27, 2008 call to Deavitt. HT 103. The note reads, "Call to Karl Deavitt to ask if I could have my job back. He did not answer. I left a message asking him to call me." JX 11. Based on Nagle's note on the telephone records, which was written closer in time to the events, the ALJ finds that it is more likely than not that Nagle's December 27, 2008 message for Deavitt simply asked Deavitt to call him and did not specifically mention his job. This finding is not critical to disposition of the case, however, as Deavitt admitted that he assumed from the message that Nagle wanted to discuss the situation at work. HT at 205-07, 220-21,

- 12 -

neither partner had the authority to hire or fire personnel without the other partner's concurrence. *Id.* At some point during the week of December 29, 2008, Hubbert informed Deavitt of his telephone conversation with Nagle on December 27, 2008. *Id.* at 333-34.

## III. Conclusions of Law

### A. Analytical Framework

The AIRA prohibits air carriers, contractors, and their subcontractors from discharging or otherwise discriminating against any employee with respect to the employee's compensation, terms, conditions, or privileges of employment because the employee "provided, caused to be provided, or is about to provide (with any knowledge of the employer) to the employer or Federal Government information relating to any violation or alleged violation of any order, regulation, or standard of the Federal Aviation Administration or any other provision of Federal law relating to air carrier safety under this subtitle or any other law of the United States." 49 U.S.C. § 42121(a). The implementing regulations provide that an employer violates the AIRA if it intimidates, threatens, restrains, coerces, or blacklists an employee because of protected activity. 29 C.F.R. § 1979.102(b). A complainant has the burden of proving the following facts by a preponderance of the evidence: (1) that he or she engaged in protected activity; (2) that the employer knew of the protected activity; (3) that the employee suffered an unfavorable or "adverse" personnel action; and (4) that the employee's protected activity was a contributing factor in the unfavorable personnel action. *Clemmons v. Ameristar Airways, Inc.*, USDOL/OALJ Reporter, ARB Nos. 05-048, 05-096, ALJ No. 2004-AIR-11 at 6 (ARB June 29, 2007), *available at* 2007 WL 1935557, at *4. Failure to prove any one of these four elements warrants dismissal of an AIRA complaint. *Hindsman v. Delta Air Lines, Inc.*, USDOL/OALJ Reporter, ARB No. 09-023, ALJ N0. 2008-AIR-013 at 5 (ARB June 30, 2010), *available at* 2010 WL 2680567, at *2. However, if a complainant carries this burden, he or she is entitled to relief under the AIRA unless the employer demonstrates by clear and convincing evidence that it would have taken the same unfavorable action in the absence of the protected activity. *Brune v. Horizon Air Industries, Inc.*, USDOL/OALJ Reporter, ARB No. 04-037, ALJ No. 2002-AIR-8 at 13 (ARB Jan. 31, 2006), *available at* 2006 WL 282113, at *9.

### B. Protected Activity and Employer Knowledge

The Act protects an employee who provides "information" to an employer, or to the federal government with the employer's knowledge, "relating to any violation or alleged violation of any order, regulation, or standard of the Federal Aviation Administration or any other provision of Federal law relating to air carrier safety . . . ." 49 U.S.C. § 42121(a)(1). Protected activity under the AIRA has two elements: (1) the information that the complainant provides must involve a purported violation of a regulation, order, or standard relating to air carrier safety, though the complainant need not prove an actual violation; and (2) the complainant's belief that a violation occurred must be objectively reasonable. *Hindsman*, 2010 WL 2680567, at *3. The information provided "must be specific in relation to a given practice, condition, directive or event," and the employee "reasonably must believe in the existence of a violation." *Simpson v. United Parcel Service*, USDOL/OALJ Reporter, ARB No. 06-065, ALJ Case No. 2005-AIR-031 at 5 (ARB Mar. 14, 2008), *available at* 2008 WL 921123 (citing *Clean Harbors Envtl. Servs. v. Herman*, 146 F.3d 12, 19-21 (1st Cir. 1998)). While a complainant need

- 13 -

not cite a specific violation, the information "must at least relate to violations of FAA orders, regulations, or standards (or any other violations of federal law relating to aviation safety)" in order to be afforded protection under the AIRA. *Id.* Thus, the reporting of health or safety problems that do not relate to aviation safety are not protected. *Mehen v. Delta Air Lines Inc.,* USDOL/OALJ Reporter, ARB No. 03-070, ALJ No. 2003-AIR-4 at 4 (ARB Feb. 24, 2005), *available at* 2005 WL 489735, at *3. Moreover, providing "information" is critical to invoking the AIRA's protection; "[c]ompetently" and "aggressively" carrying out duties to ensure safety, though laudable, does not by itself constitute protected activity." *Sievers v. Alaska Airlines, Inc.* *(Sievers)*, USDOL/OALJ Reporter, ARB No. 05-109, ALJ No. 2004-AIR-28 at 5 (ARB Jan. 30, 2008), *available at* 2008 WL 316012, at *4.

Nagle contends that he engaged in three acts protected by AIRA: (1) informing his employers at Unified Turbine that he believed that M was abusing his prescription medication; (2) informing his employers that M appeared to have an interest in K's prescription medication; and (3) informing his employers that he had seen M selling narcotics while at work. The parties stipulated that Unified Turbines is an FAA approved repair station under 14 C.F.R. Part 145 which governs the procedure a repair facility must follow to obtain FAA certification to perform maintenance, preventive maintenance, or alterations of an aircraft, airframe, aircraft engine, propeller, appliance, or component parts. 14 C.F.R. § 145.1. Deavitt's testimony establishes that M performed "safety-sensitive" functions that subjected him to random drug testing. HT 242, 245. The FAA regulations contain extensive drug testing provisions for aviation industry workers who perform safety-sensitive functions for certificate holders. 14 C.F.R. Part 120. As pertinent to the instant matter, those regulations state that:

> No certificate holder or operator may knowingly use any individual to perform, nor may any individual perform for a certificate holder or an operator, either directly or by contract, any function listed in subpart E of this part while that individual has a prohibited drug, as defined in that subpart, in his or her system.

14 C.F.R. § 120.33(b). The regulations further state that an employer must perform testing when there is reasonable cause to suspect that a safety-sensitive worker is using prohibited drugs:

> Each employer must test each employee who performs a safety-sensitive function and who is reasonably suspected of having used a prohibited drug. The decision to test must be based on a reasonable and articulable belief that the employee is using a prohibited drug on the basis of specific contemporaneous physical, behavioral, or performance indicators of probable drug use. At least two of the employee's supervisors, one of whom is trained in detection of the symptoms of possible drug use, must substantiate and concur in the decision to test an employee who is reasonably suspected of drug use; except that in the case of an employer, other than a part 121 certificate holder, who employs 50 or fewer employees who perform safety-sensitive functions, one supervisor who is trained in detection of symptoms of possible drug use must substantiate the decision to test an employee who is reasonably suspected of drug use.

14 C.F.R. § 120.109(d). A "prohibited drug" is defined by the regulations as "marijuana, cocaine, opiates, phencyclidine (PCP), and amphetamines, as specified in 49 CFR 40.85." 14 C.F.R. § 120.7(m).[10]

The evidence in this case establishes that M was abusing prescription opiates during the fall of 2008 when Nagle complained to his superiors, and that M's job performance in this time frame deteriorated. On this record, the ALJ finds that Nagle's complaints to Unified Turbines that M was abusing prescription opiate pain medication on the job provided information involving a purported violation of the FAA's regulations governing drug use and testing for safety-sensitive aviation workers. Whether Nagle's belief was objectively reasonable "depends on the knowledge available to a reasonable person in the circumstances with the employee's training and experience." *Malmanger v. AIR EVAC EMS, Inc.*, USDOL/OALJ Reporter, ARB No. 08-071, ALJ No. 2007-AIR-008 at 8 (ARB July 2, 2009), *available at* 2009 WL 2371239, at *5. There is no evidence that Nagle has any detailed knowledge of the FAA's regulations pertaining to drug use and testing. However, he is a very experienced welder with extensive exposure to aircraft repair, and he was aware that the Unified Turbines substance abuse policy states that "[a]ny involvement with alcohol and drugs which adversely affect the work place will not be tolerated." HT at 46; JX 9 at 1. He also testified that he personally observed a deterioration in M's work that coincided with his use of prescription opiates, an observation that was confirmed by M and shop inspector Martin. Additionally, Nagle viewed M's perceived drug problem as a "safety issue" in that he was concerned that M could injure himself or a coworker on the job, and explained that the deterioration in the quality of M's work potentially compromised the aircraft engine components. HT at 43-44. On these facts, the ALJ finds that reasonable person with Nagle's training and experience could believe that M's ongoing abuse of drugs and deteriorating performance was in violation of FAA regulations. Accordingly, the ALJ concludes that Nagle engaged in activity protected by the AIRA when he provided information to his employers at Unified Turbines that M was abusing his prescription narcotic medication on the job.[11] The ALJ further concludes that Nagle has proved the second element of an AIRA claim—employer knowledge of protected activity—as it is undisputed that Unified Turbines was aware of Nagle's protected reports of suspected drug abuse by M.

---

[10]The regulation at 49 C.F.R. § 40.85, which is part of the Department of Transportation's ("DOT") rules for drug and alcohol testing programs in regulated transportation industry workplaces, states that drug testing laboratories are responsible for testing for the following five drugs or classes of drugs in a DOT drug test:

  (a) Marijuana metabolites.
  (b) Cocaine metabolites.
  (c) Amphetamines.
  (d) Opiate metabolites.
  (e) Phencyclidine (PCP).

45 C.F.R. § 40.85.

[11]The ALJ concludes that Nagle's report to the Winooski Police on December 16, 2008, was not protected by the AIRA because the report was not made to the federal government or at the direction of a federal entity. *Cf. Svendsen v. Air Methods, Inc.*, ALJ No. 2002-AIR-16, slip op. at 48 (ALJ Mar. 3, 2003) (report to local police protected under the AIRA where complainant first contacted federal agency which instructed him to go to the local police), *available at* http://www.oalj.dol.gov/PUBLIC/WHISTLEBLOWER/DECISIONS/. ALJ_DECISIONS/AIR/02AIR16A.HTM, *aff'd*, 2004 WL 1923132 (DOL Adm.Rev.Bd. Aug. 26, 2004).

## C. Adverse Personal Action

The Administrative Review Board ("ARB") has held that "the purpose of the employee protections that the Labor Department administers is to encourage employees to freely report noncompliance with safety, environmental, or securities regulations and thus protect the public." *Melton v. Yellow Transportation, Inc.*, USDOL/OALJ Reporter, ARB No. 06-052, ALJ No. 2005-STA-2 at 20 (ARB Sept. 30, 2008), *available at* 2008 WL 4462979, at *15. In order to effectuate this purpose, the ARB determines whether an employer's action is "adverse" by considering "whether it would deter a similarly situated person from reporting a safety or environmental or securities concern." *Id.* As the ARB summarized,

> not every action taken by an employer that renders an employee unhappy constitutes an adverse employment action. The employee protections that the Labor Department administers are not "general civility codes," nor do they make ordinary tribulations of the workplace actionable. Actions that cause the employee only temporary unhappiness do not have an adverse effect on compensation, terms, conditions, or privileges of employment . . . our task has always been, and will continue to be, to separate harmful employer action from petty, minor workplace tribulations.

*Id.* at *17 (internal citations and footnotes omitted); *see also Hirst v. Southeast Airlines, Inc.*, USDOL/OALJ Reporter, ARB Nos. 04-116, 04-160, ALJ No. 2003-AIR-47 at (ARB Jan. 31, 2007), *available at* 2007 WL 352447, at *5.

The focal point of the litigation in this case and the most significant area of dispute between the parties is whether Unified Turbines "fired" Nagle on December 24, 2008 or whether he abandoned his employment after being sent home without loss of pay following the altercation with M. If the facts represent the former scenario, there is no question that an involuntary termination is an "adverse" employment action that would dissuade any reasonable employee from engaging in protected activity. On the other hand, angrily sending an employee home accompanied by profanity after an altercation with a coworker without loss of pay or other adverse effect on his conditions of employment can be fairly classified as the type of workplace tribulation that produces no more than temporary unhappiness and is not actionable under the federal employee protection statutes including the AIRA. *Melton*, 2008 WL 4462979, at *15. For the reasons discussed below, the ALJ concludes that Nagle was not subjected to an adverse action for which he can seek redress under the AIRA.

First, it is undisputed that Deavitt never told Nagle that he was fired, that his employment was terminated, or that he should not return to work at Unified Turbines. Second, the ALJ finds that the weight of the evidence establishes that Deavitt did not simply tell Nagle to go home in a profanity-laced tirade in the parking lot outside of Unified Turbines on the morning of December 24, 2008. Dan Hubbert testified that Nagle called him on December 27, 2008. Hubbert testified that Nagle relayed that Deavitt had told him "to put his F-ing truck in gear . . . [and] take the long weekend to think about what he had done . . . ." HT at 325. Based on observation of his demeanor and in consideration of his testimony in light of the entire record, the ALJ finds that Hubbert is a particularly credible and neutral witness who showed no tendency to color or shape his testimony despite his long friendship with Nagle and continued employment relationship with

- 16 -

Unified Turbines. Moreover, while the ALJ does not credit Deavitt's testimony that he repeated his directives to Nagle after he had returned to the shop, Hubbert's testimony that Nagle acknowledged being told to take the long weekend to think about what he had done, is consistent with William Kinsell's testimony that Deavitt stated upon reentering the shop from the parking lot "that he told John that he had four days, because we had a four-day vacation, to think about if he wanted to still work at Unified Turbines and, if not, he could leave." HT at 308. Noting that Deavitt made these statements moments after his heated conversation with Nagle in the parking lot, the ALJ finds that it is highly probable that the statements are accurately reflective of what Deavitt said to Nagle. Therefore, the ALJ finds that not only did Deavitt not tell Nagle that he was fired, he told him to think things over during the upcoming holiday weekend. Finally, the fact that Unified Turbines paid the Claimant for the duration of his shift on December 24, 2008, and for both the Christmas and Boxing Day holidays is corroborative of Unified Turbines' claim that Deavitt did not fire Nagle on December 24, 2008. Consequently, the ALJ finds that Nagle was not fired on December 24, 2008, but rather that he was sent home two hours early without loss of pay because he had been involved in a physical altercation in the shop with M.

The ALJ further finds that the evidence related to the events following December 24, 2008, establish that Nagle abandoned his job and was not subjected to any adverse personnel action. When Nagle called Deavitt on December 27, 2008, and expressed a belief that he'd been fired, Hubbert got Nagle to recognize that Deavitt had not said that he was fired. Hubbert also tried to persuade Nagle to return to Unified Turbines on Monday after the holiday weekend to discuss his status. Nagle declined to return to work on Monday and he instead called Deavitt over the weekend and left a message that was not returned. Nagle's claim that these facts—essentially an unreturned telephone call—removed any ambiguity lingering from December 24th and confirmed that he'd been fired is simply untenable. Under Vermont law, an employer's statement that an employee has the option of either "shaping up or shipping out" does not equate to an involuntary or coerced termination. *Lane v. Department of Employment Sec.*, 134 Vt. 9, 11, 347 A.2d 454, 456 (1975); *see also Hamilton v. Department of Employment Sec.*, 139 Vt. 326, 328-29, 428 A.2d 1108, 1109 (1981) (resignation after warning of termination if performance did not improve was not involuntary or coerced).[12] Nagle was told to go home and think things over which at most is tantamount to a "shape up or ship out" directive. However, the more appropriate reading is that Deavitt simply told Nagle to think about what he had done and if he wanted to stay at Unified Turbines—a decision to be made on Nagle's own accord—as Deavitt never expressly mentioned the possibility of Nagle being fired.

There is ample evidence in the record that Nagle was dissatisfied with his job and planned to quit. There also is uncontradicted evidence that Unified Turbines accommodated Nagle's family situation and tolerated his chronic tardiness. In these circumstances, the ALJ finds that Nagle's professed assumption that he'd been terminated and his decision not to report to work on Monday, December 29, 2008, were objectively unreasonable and can only be characterized as a voluntary resignation.

Having determined that Nagle was not subjected to an adverse personnel action, a necessary element of an AIRA claim, the ALJ must conclude that his complaint is without merit.

---

[12]Nagle makes no claim that he was constructively terminated or coerced into involuntarily resigning.

## IV. Order

The complaint filed by John Nagle is **DISMISSED**.

**SO ORDERED**.

*Daniel F. Sutton*

**DANIEL F. SUTTON**
Administrative Law Judge

Boston, Massachusetts

**NOTICE OF APPEAL RIGHTS**: To appeal, you must file a Petition for Review ("Petition") with the Administrative Review Board ("Board") within ten (10) business days of the date of issuance of the administrative law judge's decision. The Board's address is: Administrative Review Board, U.S. Department of Labor, Suite S-5220, 200 Constitution Avenue, NW, Washington DC 20210. Your Petition is considered filed on the date of its postmark, facsimile transmittal, or e-mail communication; but if you file it in person, by hand-delivery or other means, it is filed when the Board receives it. *See* 29 C.F.R. § 1979.110(a). Your Petition must specifically identify the findings, conclusions or orders to which you object. You waive any objections you do not raise specifically. *See* 29 C.F.R. § 1979.110(a).

At the time you file the Petition with the Board, you must serve it on all parties as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges, 800 K Street, NW, Suite 400-North, Washington, DC 20001-8002. You must also serve the Assistant Secretary, Occupational Safety and Health Administration and the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, DC 20210. *See* 29 C.F.R. § 1979.110(a).

If no Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor pursuant to 29 C.F.R. § 1979.110. Even if a Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor unless the Board issues an order within thirty (30) days of the date the Petition is filed notifying the parties that it has accepted the case for review. *See* 29 C.F.R. §§ 1979.109(c) and 1979.110(a) and (b).

## SERVICE SHEET

Case Name: NAGLE_JOHN_v_UNIFIED_TURBINES_INC_

Case Number: **2009AIR00024**

Document Title: **DECISION AND ORDER DISMISSING COMPLAINT**

I hereby certify that a copy of the above-referenced document was sent to the following this 27th day of September, 2010:

*Deneen Davis*
**DENEEN DAVIS**
LEGAL ASSISTANT

Regional Administrator
Region 1
U. S. Department of Labor, OSHA
Room E340
JFK Federal Building
Boston, MA 02203
   *{Hard Copy - Regular Mail}*

Regional Solicitor
U. S. Department of Labor
JFK Federal Building
25 New Sudbury Street, Room E-375
Boston, MA 02203
   *{Hard Copy - Regular Mail}*

Directorate of Enforcement Programs
U. S. Department of Labor, OSHA
Room N-3119, FPB
200 Constitution Ave., N.W.
Washington, DC 20210
   *{Hard Copy - Regular Mail}*

Associate Solicitor
Division of Fair Labor Standards
U. S. Department of Labor
Room N-2716, FPB
200 Constitution Ave., N.W.
Washington, DC 20210
   *{Hard Copy - Regular Mail}*

Federal Aviation Administration
Attn: Mr. Gene Kirkendall, Room 831
Whistleblower Protection Program Manager
800 Independence Ave., S.W.
Washington, DC 20591
   *{Hard Copy - Regular Mail}*

Lisa M Werner, Esq.
Clark, Werner & Flynn, P.C.
192 College Street
Burlington, VT 05401
   *{Hard Copy - Regular Mail}*

John L Franco, Jr., Esq.
Attorney for Unified Turbines, Inc.
110 Main Street
Burlington, VT 05401
   *{Hard Copy - Regular Mail}*

**SERVICE SHEET** continued (2009AIR00024 Case Decision)    Page: 2

John Nagle
983 Holy Cross Road
Apartment 4
Colchester, VT 05446
        *{Hard Copy - Regular Mail}*

Unified Turbines, Inc.
28 Catamount Drive
Milton, VT 05468
        *{Hard Copy - Regular Mail}*

Mary E Hoye
U.S. Department of Labor
Occupational Safety and Health Administration
1441Main Street, Room 550
Springfield, MA 01103
        *{Hard Copy - Regular Mail}*

Administrative Review Board
U.S. Department of Labor
Suite S-5220
200 Constitution Ave., N.W.
Washington, DC 20210
        *{Hard Copy - Regular Mail}*